NELSON P. COHEN
United States Attorney

SUSAN J. LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
Susan.Lindquist@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOEL WALLENDER, | ) Case No. 3:05-cv-263-JKS |
| | ) |
| Plaintiff, | ) |
| | ) **UNITED STATES' MOTION TO** |
| vs. | ) **DISMISS ALL CLAIMS** |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Defendant, United States, through counsel, moves to dismiss Joel

Wallender's ("Mr. Wallender's") claims, pursuant to Fed.R.Civ.P. 12(b)(1) and

12(b)(6).  Assuming all the facts alleged by plaintiff are true, Mr. Wallender's

primary claim, that the Government failed in its contractual duty to review

Osborne Construction Co.'s ("Osborne's") Accident Prevention Plan ("Plan")[1], is

based in contract, not tort, and thus the Federal District Court lacks subject matter

jurisdiction.  Furthermore, because the government did not retain sufficient control

over the project premises, and because the Project did not present a peculiar risk of

physical harm, Mr. Wallender has failed to state any claim upon which relief may

be granted.

## STANDARD OF REVIEW

The court may dismiss a claim, pursuant to Fed. R. Civ. P. 12(b)(1), if the

court lacks subject matter jurisdiction.  The plaintiff has the burden to prove the

existence of subject matter jurisdiction.  <u>Sopcak v. Northern Mountain Helicopter

Serv.</u>, 52 F.3d 817, 818 (9th Cir. 1995).  When considering the motion to dismiss,

the District Court may review any evidence outside the pleadings in order to

resolve factual disputes concerning whether it has jurisdiction.  <u>McCarthy v.

United States</u>, 850 F.2d 558 (9th Cir. 1988), <u>cert.</u> <u>denied</u>, 489 U.S. 1052 (1989).

---

[1]  Pertinent parts of the Plan form Exhibit 3.  The Plan is referred to with
various names throughout documents.  Osborne labeled its ninety page Plan as the
Accident Prevention and Site Safety Plan.  Within that document is a sub-plan
called the Fall Protection Safety Plan.  Any reference to any part of the ninety page
document will be referred to as the Plan.

The court may dismiss a claim, pursuant to Fed. R. Civ. P. 12(b)(6), if the plaintiff has failed to state a claim upon which relief can be granted.  See, e.g., Rodriguez v. Panayiotou, 314 F.3d 979, 983 (9th Cir. 2002).  Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  Therefore, a court should dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Vignolo v. Mille, 120 F.3d 1075, 1077 (9th Cir. 1997).  Even when the facts of the case are viewed in a light most favorable to the nonmoving party, there must be no doubt that the movant is entitled to judgment as a matter of law.  Stevens Creek Associates v. Barclays Bank of California, 915 F.2d 1355 (9th Cir. 1990).

The District Court may dismiss this claim if the plaintiff has not alleged a tort violation cognizable under Alaska state law.  Under the Federal Tort Claims Act ("FTCA"), the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  To determine whether a private person would be liable in this case, the

court must apply "the law of the place where the act or omission occurred."  28

U.S.C. § 1346(b).

## FACTS

### A.    The Contract

On June 27, 2001, the United States Army Corp of Engineers (CoE)

contracted with Osborne for the Replacement Family Housing Project at Fort

Wainwright, Alaska.  Ex. B at 6.  Osborne contracted to demolish twelve 8-plexes,

to construct seven new 4-plexes upon the original foundations, and to construct

nine new buildings with 4, 5, and 6-plex units.  Osborne was responsible for

managing and supervising all work necessary to complete this project.  Contract

Clause 52.236-6 states:

> At all times during performance of this contract and until the work is
> completed and accepted, the Contractor shall directly superintend the work,
> or assign and have on the worksite a competent superintendent who is
> satisfactory to the Contracting Officer and has authority to act for the
> Contractor.

Ex. B at 91.

The contract also made Osborne specifically and solely responsible for

preventing accidents, and for complying with the proper regulations when

constructing, dismantling, demolishing, or improving buildings.  Contract Clause

52.236-13 states:

> a) The Contractor shall provide and maintain work environments and procedures which will
>    (1) safeguard the public and Government personnel, property, materials, supplies, and equipment exposed to Contractor operations and activities
>
> . . .
>
> (b) For these purposes on contracts for construction or dismantling, demolition, or removal of improvements, the Contractor shall-
>    (1) Provide appropriate safety barricades, signs, and signal lights;
>    (2) Comply with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910; and
>    (3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for the purposes are taken.
>
> (c) If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of the solicitation.

Ex. B at 93.  Because Osborne had the ultimate responsible for safety, the

procedure specified in the contract stated that the CoE would raise noncompliance

issues exclusively with Osborne's management.

> (d) Whenever the Contracting Officer becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request immediate

initiation of corrective action. . . . If the Contractor fails or refuses to promptly take corrective action, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken.

Id.

To ensure Osborne's compliance with the contract terms, the CoE reserved the right to inspect all work for its own benefit. Contract Clause 52.246-12 states:

(c)    Government inspections and tests are for the sole benefit of the Government and do not-
    (1)    Relieve the Contractor of responsibility for providing adequate quality control measures;
    (2)    Relieve the Contractor of responsibility for damage to or loss of the material before acceptance;
    (3)    Constitute or imply acceptance; or
    (4)    Affect the continuing rights of the Government after acceptance of the completed work under paragraph (i) of this section.
(d)    The presence or absence of a Government inspector does not relieve the Contractor from any contract requirement, nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization.

Ex. B at 100-1. In addition, Contract Clause 52.242-14 states that CoE had the right to suspend work, "for the period of time that the Contracting Officer determines appropriate for the convenience of the Government." Ex. B at 96.

On May 10, 2002, the CoE and Osborne conducted a pre-construction conference in order to orient Osborne to "the procedure, policy, and lines of

authority for contractual, administrative, and construction matters." Ex. D at 110.

Notes from the Conference indicate that the parties discussed Safety and Accident

Prevention, and that CoE communicated the obligation Osborne had to create an

Accident Prevention Plan and to identify "hazardous conditions for each definable

feature of work." Ex. D at 122. CoE explained to Osborne that the EM 385-1-1,

the United States Army Corps of Engineers Safety and Health Requirements

Manual, contained "guidelines for preparation of your Accident Prevention Plan,"

and that all of Osborne's construction operations should comply with EM 385-1-1.

Id.

### B.    The Accident Prevention and Site Safety Plan

Osborne had the contractual responsibility to create a Plan and to obtain the

CoE's approval. See Ex. B at 230. ("The Contractor shall obtain the Contracting

Officer's approval of the Accident Prevention Plan required by the Safety and

Health Requirements Manual . . . prior to start of any work at the project site.").

Osborne submitted multiple versions of its Plan before the CoE granted approval.

On May 14, 2002, the CoE disapproved Osborne's first Plan and required

resubmission, in part, because the Plan failed to refer to Appendix A of EM 385-1-

1 or to provide site-specific documentation for all required items. Ex. G at 306.

On August 20, 2002, the CoE accepted Osborne's new Plan, but again required

resubmission, in part, because Osborne failed to include EM 385-1-1 in its list of

on-site required manuals.  Ex. G at 309.  The CoE approved Osborne's Plan on

September 6, 2002.  Ex. G at 312.

Section 21 of Osborne's Plan required that employees working near a

leading edge six feet or more above a lower level, be protected by "the use of a

guardrail system, or personal fall arrest system."  Ex. C at 96.  Osborne's Plan

defined a Guardrail System as a "barrier erected to prevent an employee from

falling to lower levels," and a Personal Fall Arrest System as a "system used to

arrest an employee in a fall from a working level . . . [which may consist] of an

anchorage, connectors and body harness, and may include a lanyard, deceleration

device, lifeline or suitable combinations of these."  Ex. C at 95.  Osborne's Plan

requirement differed from the CoE's EM 385-1-1 manual, which stated that any

opening through which a man could fall must be "guarded by a physical barrier or

covered."  Ex. A at 245.  Osborne's requirement also differed from the OSHA

regulations for guarding floor and wall openings and holes, which states that

"[e]very stairway floor opening shall be guarded by a standard railing," and that

"[e]very hatchway and chute floor opening shall be guarded" by a hinged floor

opening cover or a removable railing. 29 CFR § 1910.23. Neither EM 385-1-1 nor 29 CFR § 1910.23 allowed the option of using a personal fall arrest in place of a physical barrier, but the Osborne Plan allowed the option.

Mr. Glenn Zahn, the CoE's Project Engineer on the Replacement Family Housing Project, read Osborne's Plan to "check that it addressed every feature of work in their contract and hazards normally associated with each feature of work." Ex. I ¶ 3. Mr. Zahn does not know why the Plan was approved with a deviation from the EM 385-1-1 fall protection requirements. Although Osborne's Plan was not perfect, Mr. Zahn stated that Osborne was "one of the most professional contracting firms" he has ever worked with, and that he "had no reason to suspect that Osborne's managers would not insure that its employees complied with the fall protection procedure." Ex. I ¶ 8.

Osborne's site superintendent was "responsible for ensuring that all employees [were] familiar with the fall protection work plan and adhere[d] to its guidelines." Ex. C at 96. On February 14, 2002, Osborne held an orientation program for all employees working on the Fort Wainwright Project. Ex. F at 2. During this orientation, Osborne explained the Plan to its employees, including Rule #20 of the Additional Rules and Regulations:

> Fall protection shall be maintained at all times a worker is exposed to a fall. Fall protection is accomplished by using a scaffold with rails, guardrails at specific areas or the use of a full body harness and lanyard attached to a lifeline and anchored to the structure. Employees engaged in working on roofs are required to wear fall protection equipment. Employees involved in metal siding shall accomplish the task with the use of the rolling scaffold with all guardrails in place. Employees required to work in these areas will receive additional training prior to starting.

Ex. F at 8. Mr. Wallender signed the Orientation Form, acknowledging that he received, read, understood, and agreed to Osborne's Safe Work Rules and Policies." Ex. F at 9. By signing this Form, Mr. Wallender agreed to abide by Osborne's Plan. Id. On July 24, 2002, Mr. Wallender also signed a form confirming that he "received fall protection orientation including the material covered in the Fall Protection Work Plan." Ex. E at 274.

Mr. Zahn stated that he typically visited the work site "once a day to discuss issues on the job with Osborne's Quality Control (QC) representative, Chris Seeley, or with Osborne's superintendent, Jeff Crawford." Ex. I ¶ 4. The visits lasted from fifteen minutes to three hours, depending on the need to discuss issues and on Mr. Zahn's scheduling constraints.[2] Id. In his role as Project Engineer, Mr. Zahn would generally speak with management regarding problems or

---

[2] Mr. Zahn was simultaneously responsible for another large housing project, which included the demolition of six 8-plex buildings and constructing six 4-plexes upon the existing foundations. Ex. I ¶ 4

concerns raised during visits, and on this particular project, he never spoke to anyone besides the QC representative or Superintendent.  Ex. I ¶ 5.  At the job site, Mr. Zahn never saw holes or openings that were not covered or barricaded.  Ex. I ¶ 6.

### C.    The Accident and Lawsuit

On August 5, 2002, Mr. Wallender was removing fall protection anchors from around a stairway opening, approximately 6.5 feet X 9.5 feet in size, so that wall partitions could be installed on the second floor deck.  Complaint ¶ 10.  At approximately 9:15 AM, an Osborne employee found Mr. Wallender lying injured on the basement floor.  Complaint ¶ 7.  Although no one witnessed the fall, evidence indicates that Mr. Wallender fell the approximately 18.5 feet onto the concrete floor.  Complaint ¶ 10.  Mr. Wallender sustained serious injuries, including trauma to his spine and head.  Complaint ¶ 22.

The Investigating Officer ("IO") determined that the proximate cause of the accident was Mr. Wallender's failure "to tie off in accordance with the Fall Protection Plan."  Ex. H at 221.  A contributing factor was "that the anchors were installed to [sic] close to the edge of the opening."  Id.  As the IO explained:

> Mr. Wallender was equipped with a personal fall protection system at the time of the accident.  He was wearing a safety harness and shock absorbing

> lanyard but was not tied off. . . . [In addition, the] fall protection anchors
> were not installed according to the manufacturers installation instructions.
> These instructions require that anchors be placed at least 6 feet from an
> edge.  The anchors in this case were placed on the edge of the opening.

Ex. H at 221.  Mr. Wallender previously "received fall protection training by a

competent individual and was known to have properly used the personal fall

protection system on previous occasions."  Id.  At the time of the accident, Mr.

Zahn was on annual leave and thus not onsite.  No other CoE employee covered

for Mr. Zahn, "since Osborne was in charge of managing and completing the

project."  Ex. I ¶ 7.

    Mr. Wallender does not list each cause of action separately, but from the

Complaint and other information, the United States infers three alleged breaches

of duty:

    (1)    CoE should not have approved the Osborne safety plan "without
               including the requirement for covering or barricading openings as
               required by EM 385-1-1."  Complaint ¶ 15.
    (2)    As owner of the premises, CoE should have taken preventative
               measures to remedy dangerous conditions.  Complaint ¶ 20.
    (3)    CoE should have taken preventative measures or warned Osborne in
               response to areas of danger.  Complaint ¶ 18.

# ANALYSIS

## I.    THIS COURT LACKS JURISDICTION OVER MR. WALLENDER'S MAIN CLAIM, WHICH ARISES FROM CONTRACT.

"A negligence action can exist only if the defendant owes the plaintiff a duty of care."  <u>St. Denis v. Department of Hous. & Urban Dev.</u>, 900 F. Supp. 1194, 1205 (D. Alaska 1995).  Mr. Wallender alleges that the CoE breached a duty to use care in reviewing Osborne's Plan.  Complaint ¶16.  The contract provided that "[t]he Contractor shall obtain the Contracting Officer's approval of the Accident Prevention Plan required by the Safety and Health Requirement's Manual. . . ."  Ex. B at 8.  Mr. Wallender claims that if the CoE had ensured that the Plan provided that all open spaces through which a person could fall were to be covered or barricaded, Mr. Wallender would not have fallen through the open space of the new stairwell.  If the claimed duty only exists by virtue of the contract, Mr. Wallender's tort claim must be dismissed because the FTCA only provides jurisdiction when the alleged breach of duty is tortious under state law, or when government has breached a duty under federal law that is analogous to duty of care recognized by state law.  28 U.S.C.A. §§ 1346(b), 2674.[3]

_____

[3]  Mr. Wallender may have fashioned his claim as a tort to prevent jurisdictional and legal bars.  The Little Tucker Act provides jurisdiction in federal district court for contract disputes based only when the amount in controversy

The Alaska Supreme Court distinguishes a claim that sounds in contract from one that sounds in tort. K & K Recycling Inc. v. Alaska Gold Company, 80 P.3d 702, 717 (Alaska 2003). (". . . every contract breach cannot be turned into a tort"). If the contract imposes the duty in question, rather than the law, then the claim is based in contract. State of Alaska Department of Natural Resources v. Transamerica Premier Insurance Co., 856 P.2d 766, 772 (Alaska 1993); Alaska Pac. Insurance Co. v. Collins, 794 P.2d 936, 946 (Alaska 1990). When the "duty arises solely from a contractual promise, a party cannot use a tort action to enforce it." 856 P.2d at 772; 794 P.2d at 946 ("Promises set forth in a contract must be enforced by an action on that contract."). In K & K Recycling, Inc, K& K bought a dredge from the Defendant and then claimed that the Defendant prevented him from recovering it. K& K claimed that the Defendant committed the tort of conversion. The court found that the claims concerned contractual breaches and disputes and thus "sound in contract, rather than tort." 80 P.3d at 717. The Court concluded that "[i]f K & K's claims could stand, then any contract case involving the transfer of goods or realty would also contain a trespass, conversion, or

---

does not exceed $10,000.00. 28 U.S.C. § 1346. Moreover, as the contract was between Osborne and the United States, Mr. Wallender is not in privity of contract with the government and therefore has no standing to sue for a contract breach. *See* Centers v. United States, 71 Fed. Cl. 529, 529 (2006).

wrongful withholding claim." Id.

Federal Courts considering whether a duty arises in contract or tort have concluded that contractual rights and obligations are distinct from establishing a duty under tort, which is independent of a contract claim. Littlefield v. United States, 927 F.2d 1099, 1104 (9th Cir. 1991) (noting that the Court "may not mix tort apples with contract oranges"). "[W]here the 'tort' complained of is based entirely upon breach by the government of a promise made by it in a contract, so that the claim is in substance a breach of contract claim, and only incidentally and conceptually also a tort claim," it does not fall within the ambit of the Federal Tort Claims Act. Woodbury v. United States, 313 F.2d 291, 295 (9th Cir. 1963). This distinction is important because state law governs the adjudication of FTCA claims and federal law governs the interpretation of federal contracts. Id. To allow a Plaintiff to waive the contract and sue in tort would blur the distinction between jurisdictional forums crafted by Congress. Id.

In Woodbury, a federal housing agency had loaned the Plaintiff money for the construction of housing units. When the Plaintiff ultimately failed to pay back the loan, the agency foreclosed on the property. The Plaintiff then sued the agency under the FTCA for the tort of breach of fiduciary duty. The Plaintiff argued that

breach of a fiduciary duty is a tort despite the fact that the promise arose in contract. For purposes of its decision, the Court accepted the argument that the Plaintiff stated a claim that sounded in tort, but it did not allow the Plaintiff to waive the contract and sue in tort. Id. at 294. It held "that where, as in this case, the action is essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise, the action must be under the Tucker Act, and cannot be under the Federal Tort Claims Act." Id. at 296.

There is no common law or statutory duty in Alaska that requires an employer of an independent contractor to review an Accident Prevention Plan. Mr. Wallender's claim is clearly based on a promise in contract. The CoE could have written a contract that did not require Osborne to submit its Plan to the CoE. Or, it could have written a contract that did not even require a Plan. All duties related to the Plan and arose by virtue of the contract. Reviewing the Plan could only be a duty that is derived from the contract. Otherwise, any contract preserving the right of the employer of an independent contractor to review and approve plans would create a tort duty for the employer and expose it to tort liability. This court should follow K & K Recycling, Inc., and find that an alleged

breach of a promise in a contract needs to be enforced by an action on the contract. The Court should also find, like the court in <u>Woodbury</u>, that the liability, if any, depends wholly upon the government's alleged promise.  The Contract only stated that Osborne was required to submit its plan for approval.  This court would have to resort to contract interpretation, under federal law, to determine if in the contract, the CoE undertook any duty, actionable in tort by a person not in privity of contract, by the terms of the contract.  As Mr. Wallender cannot identify a common law duty owed to him, independent of contract, his claim must be dismissed for lack of jurisdiction.

## II.    THE COE DID NOT RETAIN CONTROL OVER THE PREMISES OR OSBORNE'S WORK, AND THEREFORE, HAD NO DUTY TO ENSURE THE SAFETY OF OSBORNE'S EMPLOYEES.

An owner or employer in Alaska is not normally liable for physical harm stemming from the negligence of an independent contractor.  <u>See</u> <u>Chaffin</u>, 176 F.3d 1208, 1212 (9th Cir. 1999) (citing <u>Hobbs v. Mobil Oil Corp</u>., 445 P.2d 933, 934 (Alaska 1968) and the Restatement (Second) of Torts ("Restatement") § 409).  Alaska, however, has adopted and interpreted Restatement § 414 to create a duty that the employer of an independent contractor owes when it retains control over the work:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965).  The "others" in this provision includes employees of the independent contractor.  Moloso v. State, 644 P.2d 205, 215 (Alaska 1982) (stating that the "employer of the independent contractor owes a duty to the employees of the independent contractor to avoid endangering them by its own negligence or affirmative act").

To determine the nature and extent of the control, the Alaskan Courts look to both the contractual provisions and the actual exercise of control.  Petranovich v. Matanuska Electric Association, 22 P.3d 451, 454 (Alaska 2001) (citing Moloso v. State, 644 P.2d 205, 211 (Alaska 1982)).  An examination of both the contract and CoE's actual exercise of control establishes that the CoE did not retain sufficient control over the construction project to create an independent duty.

A.    **CoE Did Not Retain Sufficient Control Under the Contract to Create a Duty.**

The contract between the CoE and Osborne construction did not grant CoE sufficient control to shift liability.  In Petranovich, the Alaska Supreme Court granted Summary Judgment for the employer, Matanuska Electric Association

Wallender v. US Army Corps of Eng.
3:05-cv-263-JKS                          -18-

(MEA), against the employee of MEA's independent contractor, Vista, based

solely on the court's interpretation of contractual provisions.  Petranovich, 22.

P.3d 451.  The court ruled that MEA did not retain sufficient control in the

contract to assume liability for the injury to the Vista employee – who was

electrocuted when securing an energized line to the top of a newly installed utility

pole – since the "precise nature and extent of control required to incur liability

under the retained control doctrine must be more than the normal right of an

employer to ensure that the work is done in a satisfactory manner."  Id. at 455.

> It is not enough that the employer has merely a general right to order the
> work stopped or resumed, to inspect its progress or to receive reports, to
> make suggestions recommendations which need not necessarily be
> followed, or to prescribe alterations and deviations. . . . There must be such
> a retention of a right of supervision that the contractor is not entirely free to
> do the work in his own way.

Id. (quoting Hammond v. Bechtel, Inc., 606 P.2d 1269, 1275 (Alaska 1980)).  The

employer of an independent contractor is not liable under Alaska's retained

control doctrine unless the contract places affirmative safety duties or actual line

management responsibilities on such an employer.

> If the employer retains only standard boilerplate provisions with respect to
> safety inspections and requirements, but assumes no affirmative duties and
> never directs the method of performance, there is insufficient control or
> supervision to render the employer liable.

Petranovich, 22 P.3d at 455 (citing Moloso, 644 P.2d at 211).

The contract in this case makes Osborne, not the CoE, responsible for compliance with safety requirements. For instance, the contract states that Osborne is responsible for providing and maintaining safe work environments and procedures. Ex. B at 93. In cases of construction or dismantling, demolition or removal of improvements, the contract makes Osborne responsible for providing "appropriate safety barricades, signs, and signal lights" and for complying "with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910," and with "all pertinent provisions of . . . EM 385-1-1." Id. As in Petranovich, nothing in the contract suggests that CoE would retain control over safety matters, provide supervision, or assume any affirmative safety duties. While CoE promoted safety by incorporating the EM 385-1-1 Manual and the OSHA regulations at 29 CFR § 1910 into the contract, and by providing Osborne with guidelines for creating an Accident Prevention Plan, it never assumed an affirmative duty or directed a specific method of safety performance.

Under Alaska law, the contractual provisions that allowed CoE to conduct inspections of the project, to require that the work be done in accordance with the contract specifications, and to suspend work, are not enough to attribute liability to

CoE.  See Hammond v. Bechtel, 606 P.2d 1269, 1275 (Alaska 1980) (stating that retained control requires more than "merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations").  The contract states that such inspections or tests are "for the sole benefit of the Government," and do not "[r]elieve the Contractor of responsibility for providing adequate quality control measures." Ex. B at 100-1.  In fact, CoE employees who witnessed noncompliance issues would report such issues directly to Osborne management, not to Osborne line employees, and Osborne's management would then have the exclusive responsibility to take corrective action.  Ex. B at 93.  Since every relevant contractual provisions made Osborne responsible for day-to-day construction operations and safety, the CoE did not retain sufficient control to assume liability for Mr. Wallender's accident.

**B.      During Construction, the CoE Did Not Exercise Actual Control.**

The CoE did not exercise actual control over operations and safety as the Osborne crew worked, and Mr. Wallender failed to allege any facts that could show, even in the most favorable light, that CoE exercised such control.  In order to impose

liability, the CoE would have had to retain such a right of supervision that "the contractor is not entirely free to do the work in his own way." Hammond, 606 P.2d at 1275. However, Mr. Glenn Zahn, the CoE's Project Engineer, stated that he only spoke to management about problems or concerns during his visits for this project, and that he did not direct or manage line employees. Ex. I ¶ 5. Although Mr. Zahn visited the work site once a day to discuss issues, he did not have any affirmative safety duties. Ex. I ¶ 4. Regardless, on his many visits to the Project, Mr. Zahn did not see any holes or openings that were not covered or barricaded. Ex. I ¶ 6. Mr. Zahn was on annual leave at the time of the accident, but since Osborne had the day-to-day responsibilities for managing and completing the project, the construction work continued. Ex. I ¶ 7. Mr. Wallender has failed to allege countervailing facts sufficient to show that CoE exercised actual control over the construction project.

Mr. Wallender's allegation that CoE had retained control over the project and thus possessed a duty to prevent this accident has no evidentiary support, and does not raise a factual dispute. Although the extent to which a party retained sufficient control is "normally a question of fact left to the jury," Petranovich, 22 P.3d at 454, this claim is baseless and thus ripe for disposition by this Court.

Since "interpretation of the terms of a contract is an issue of law," Id. (citing Davis

v. Dykman, 938 P.2d 1002, 1008 n.7 (Alaska 1997)), and since rational minds

must agree that CoE did not exercise actual control, the Court may dismiss without

further factual inquiry.  The Court should grant the Government's 12(b)(6) motion

to dismiss Wallender's claim for liability based on a theory of retained control.

## III.    THIS PROJECT DID NOT PRESENT A PECULIAR RISK OF HARM, AND THEREFORE, THE COE HAD NO DUTY TO WARN OR TAKE OTHER PREVENTIVE MEASURES.

Under Alaska law, an employer has a duty to warn or to include precautions

in the work contract if a project presents a peculiar risk of physical harm.

Restatement § 413 states:

> One who employs an independent contractor to do work which the employer
> should recognize as likely to create, during its progress, a peculiar
> unreasonable risk of physical harm to others unless special precautions are
> taken, is subject to liability for physical harm caused to them by the absence
> of such precautions if the employer
> (a) fails to provide in the contract that the contractor shall take such
> precautions
> (b) fails to exercise reasonable care to provide in some other manner for the
> taking of such precautions.

Sievers v. McClure, 746 P.2d 885, 886 (Alaska 1987) (quoting Restatement

(Second) of Torts § 413 (1965)).  If an employer violates this duty, he or she may

be liable to employees of the independent contractor.  See Id. at 887 (stating that

the employees of an independent contractor fall within the definition of "other" in Restatement § 413).

Alaska courts define peculiar unreasonable risk of physical harm as "an unusual hazard of which the contractor was unaware." Sievers, 746 P.2d at 887. Accordingly, the employer of an independent contractor is only liable for failure to warn about risks "not routinely encountered in the contractor's line of work." Id. at 890. In Sievers, the Alaska Supreme Court upheld the lower court's grant of Summary Judgment in favor of Gemco, the employer of the independent contractor that hired Sievers, because falling off of a roof is not a peculiar risk of physical harm for roofers. Id. at 890 ("Because no reasonable mind could find that the risk of falling from a sloped roof was abnormal to a contract to install a roof, Gemco could not be held responsible for the fall which led to Sievers' death."). The Court held that the liability for risks routinely encountered by independent contractors properly rested with the contractor, since he or she "is familiar with the usual hazards incident to the performance of his line of work, and is therefore in a good position to select safety procedures to minimize the risks." Id. at 888-89.

This approach is consistent with relevant comments to the Restatement. According to comment (b), Section 413 is "not concerned with the taking of

routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all ordinary and customary dangers which may arise in the course of the contemplated work."  Restatement (Second) of Torts § 413 cmt. b. (1965).  Since such precautions are the responsibility of the contractor, the contractor's employer "is not required to provide, in the contract or otherwise, that the contractor shall take them."  Id.

In this case, the risk of falling from the second floor of an uncompleted building is a risk routinely encountered by independent contractors who construct buildings.  Osborne and Mr. Wallender were aware at the time of the accident that constructing walls on the second floor of a building risks dangerous falls, and in fact, Osborne created the hole for the stairwell into which Mr. Wallender fell.  See, e.g., Littlefield v. United States, 927 F.2d 1099, 1104 (9th Cir. 1991) (stating that the employer of an independent contractor had no duty to take extra precautions, since "the dangerous condition complained of was created during the course, and as a necessary consequence, of the construction work" the independent contractor was performing) (internal quotes omitted).  Since falling during a construction project is a harm that Osborne was aware of and that Osborne acted to prevent, Mr. Wallender's injury was not caused by a peculiar risk.  Therefore, the CoE had

no duty to warn Osborne or to take extra precautions.

As in <u>Sievers</u>, Mr. Wallender's allegation that CoE failed to warn about a peculiar risk has no evidentiary support and thus raises no factual dispute. Therefore, the Court should grant the Government's 12(b)(6) motion to dismiss.

## CONCLUSION

This Court should grant the Government's motion to dismiss Mr. Wallender's tort claims, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Assuming all the facts alleged by plaintiff are true, Mr. Wallender's primary claim, that the Government failed its contractual duty to review the Osborne's Safety Plan, is based in contract, not tort, and thus the Federal District Court lacks subject matter jurisdiction.  Furthermore, because the CoE did not retain sufficient control over the project premises, and because the Project did not present a peculiar risk of physical harm, Mr. Wallender has failed to state a claim upon which relief may be granted.

// //


// //


Wallender v. US Army Corps of Eng.
3:05-cv-263-JKS                      -26-

RESPECTFULLY SUBMITTED this 25th day of August, 2006, in

Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/ Susan J. Lindquist
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053

CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2006,
a copy of the foregoing Motion to Dismiss
was served by U. S. Mail on

Peter R. Ehrhardt
Friedman Rubin et.al.
215 Fidalgo Avenue
Suite 203
Kenai, AK 99611

s/ Susan J. Lindquist