IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOEL WALLENDER,          ) | |
|        ) | CASE NO. 3:05-cv-263-JKS |
|       Plaintiff,    ) | |
|        ) | |
| vs.        ) | |
|        ) | |
| UNITED STATES OF AMERICA,  ) | |
|        ) | |
|       Defendant.  ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS ALL CLAIMS
_____

For Plaintiffs:

PETER R. EHRHARDT
Friedman, Rubin & White
215 Fidalgo Ave., Ste. 203
Kenai, AK  99611
Phone: (907)283-2876
Fax:  (907)283-2896
ehrhardt@kenai.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES      ii

I.    STANDARD OF REVIEW      2

II.    FACTS
    A.    The Contract, the Creation of the Safety Plan    3
    B.    The Accident Prevent Plan    11
    C.    The Accident and Investigations    12
    D.    Plaintiff's Complaint    20

III.    ANALYSIS

    A.    Plaintiff has Asserted a Valid Claim Under    22
        The FTCA

    B.    The CoE Assumed Affirmative Duteis with Respect    26
        To Safety and Retained Control Over Osborne's
        Performance Creating a Duty Under Alaska Tort Law
        To Ensure the Safety of Osborne's Employees

    C.    Petranovich is not Controlling as Plaintiff has    27
        Presented Compelling Evidence of the CoE's
        Retained Control and Affirmative Assumption
        Of Duties in Regard to Safety at the Site

    D.    Plaintiff has Presented Facts in Support of    32
        his Claim Which would Entitle Him to Relief

    E.    Having Established Retained Control, Negligence    37
        *per se* Violations of OSHA and Alaska's Safe Place
        to Work Act are Also Proven

        i.    OSHA Violations    38
        ii.    Violation of the Alaska Safe Place to    39
            Work Act

IV.    CONCLUSION    40

# TABLE OF AUTHORITIES

**CASES:**

Bachner v. Risch, 554 P. 2d 430, 442 (Alaska 1976)

Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)
    *citing* Conley v. Gibson, 355 U.S. 41, 45-46 (1957)

Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)
*citing* Shah v. County of Los Angeles, 797 F.2d 743, 745 (9th Cir. 1986)

*Chaffin v. United States*, 176 F.3d 1208, 1212 (9th Cir. 1999)

*Dahle v. Atlantic Richfield Company*, 725 P. 2d at 1073
(citations omitted).

*Dahle v. Atlantic Richfield Company*, 725 P.2d 1069, 1072
(Alaska 1986) *citing Moloso,* 644 P. 2d at 211.

*Hammond v. Bechtel*, 606 P.2d at 1274, fn. 7.

Moloso, 644 P.2d at 210.

*Pasko v. Commonwealth Edison Co.*, 302 N.E. 2d 642 (Ill. App. 1973)

*Petranovich,* 22 P.3d at 454.

Rodriguez v. Panayiotou, 314 F.3d 979, 983  (9th Cir. 2002)
(reversing dismissal) *citing* Van Buskirk v. Cable News Network, Inc.,
284 F.3d 977, 980 (9th Cir. 2002);

Vignolo v. Miller, 120 F.3d 1075, 1077  (9th Cir. 1997)
(reversing dismissal) *citing Parks School of Business v. Symington,*
51 F.3d 1480, 1484 (9th Cir. 1995).


**STATUTORY AUTHORITIES:**

AS 18.60.030
AS 18.60.075 (2)-(4).


**COURT RULES & OTHER REGULATIONS:**

Fed.R.Civ.P. 12(b) (1) and 129b) (6)

Plaintiff, Joel Wallender, through counsel, opposes the United States' Motion to Dismiss All Claims pursuant to Fed.R.Civ.P. 12(b) (1) and 129b) (6) (hereinafter "Government's Brief").   Plaintiff has stated a claim upon which relief may be granted under the Federal Torts Claims Act ("FTCA") and Alaska tort law.  Plaintiff's claim sounds in tort rather than contract and is allowed under the FTCA.

## I.  STANDARD OF REVIEW

A complaint should not be dismissed under Rule 12(b) (6) "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) *citing* Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Rodriguez v. Panayiotou, 314 F.3d 979, 983 (9th Cir. 2002) (reversing dismissal) *citing* Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002); Vignolo v. Miller, 120 F.3d 1075, 1077 (9th Cir. 1997) (reversing dismissal) *citing* Parks School of Business v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  On a motion to dismiss, the court accepts the facts alleged in the complaint as true. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) *citing* Shah v. County of Los Angeles, 797 F.2d 743, 745 (9th Cir. 1986).  Although dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory, neither situation is present in this case.  The government's motion should be denied.

## II.  FACTS

### A.    The Contract, the Creation of the Safety Plan and CoE's Exercise of Control

On June 27, 2001, the United States Army Corps of Engineers (CoE) entered into a twenty-two million dollar contract with Osborne Construction, an independent defense contractor, for the Replacement Family Housing Project at Fort Wainwright, Alaska ("the site").[1]  The CoE contracted Osborne to demolish twelve 8-plexes, to construct seven new 4-plexes on the original foundations, and to construct nine new buildings with 4, 5, and 6-plex units.

The contract is a 772 page document consisting of 382 pages of contract clauses and 390 pages of appendices addressing every aspect of the demolition and construction at the site.[2]  Throughout the contract, the CoE dictates how and when Osborne should perform its job, from the precise "demolition procedures, methods, sequence of operation, and equipment" to be used[3] to the picayune details of the CoE's mandatory data cataloguing and reporting methods.[4]

Peppering the contract are the CoE's directives that Osborne comply not only with applicable federal and state statutes and regulations but with the CoE's own "Safety and Health Requirements Manual" ("EM 385-1-1").[5]  Hundreds of pages long,

---

[1]  Exh. B to Government's Brief at 6.

[2]  *See generally* Contract No. DACA 85-01-C-0026 attached as Exhibit 1.

[3]  Exhibit 2 (Contract Excerpts) at p.16 (Contract Section 01010 page 10)

[4]  *Id.* at pp. 22 -31. ("Special Contract Requirements" pages 00800-6 thru 00800-16).

[5]  *See, i.e.,* Exhibit 2 at page 14 (Section 01010 p. 7 at 2.1.1(b)(demolition design criteria); page 16 (Section 01010 p. 10 at 2.1.5(a)(demolition work); pages 17 - 18 (Section 01010 p. 20 at 2.3.1(b)(civil design criteria); page 19 (Section 01010 p. 51 at

EM 385-1-1 consists of 32 parts - each containing between 1 and 13 subparts - and 19 Appendices.[6]  Rather than making simple suggestions or recommendations, EM 385-1-1 prescribes in detail the exact equipment and methods which must be used for everything from climbing a tree (Section 31-B) and the "luminescence" or brightness of lighting required in a meeting room (Table 7-1) to the exact dimensions and lettering height of accident prevention signs and tags (Table 8-1; Figures 8-1 and 8-2).[7]  The contract specifically states that the contractor's compliance with all parts of the CoE's EM 385-1-1 is mandatory.[8]

Significantly, the contract gives the CoE ultimate control over all aspects of safety and accident prevention planning and implementation at the site (a) by instructing the contractor to submit an accident prevention plan which complies with the CoE's safety requirements manual EM 385-1-1 ("the safety plan")[9] and (b) by requiring that the safety plan be approved by the CoE before the start of work:

> "The Contractor shall obtain the [CoE's] approval of the Accident Prevention Plan required by the Safety and Health Requirements Clauses prior to the start of any work at the project site."[10]

---

2.5.1 (structural design criteria); and page 13 (SCR-45 at Section 00800-19 (special contract requirements).

[6] *See, generally,* EM 385-1-1, attached hereto as an Adobe Reader File at Exhibit 3.

[7] Exhibit 4 (excerpts of EM 385-1-1) at 1 - 5.

[8] Exhibit 2 at p. 2 [Accident Prevention 52.236-13(c) and (d)] and p. 13 [SCR-45 at 00800-19]; Government's Brief at 7 and Exh. D attached thereto at 122.  The government attempts to characterize EM 385-1-1 as merely a "guideline" for preparation of the safety plan.  The plain language of the contract and the government's admission state otherwise. Id.

[9] Exhibit 2 at pp. 2 and 13 (Sec. 52.236-13(c) and SCR-45 at 00800-19, respectively).

[10] Exhibit 2 at p. 21 (Section 01015 p. 3 ("Special Items") at Part 1.4 "Accident Prevention Plan").

The safety plan approval provision is <u>not</u> included in the main text of the contract but was added as a "special item," indicating that it is not standard boilerplate, but a special condition peculiar to this project.[11]

It is undisputed that the CoE exercised actual control over the site's safety plan under the special provision for approval. By the government's admission, Osborne submitted the plan several times before the CoE granted final approval.[12] In May of 2002, the CoE disapproved the first safety plan and required resubmission in part because one reviewer found that the plan contained "canned documents that are not site specific" and failed to reference the provisions of EM 385-1-1 stating "the content not the format must be followed."[13] This statement indicates that the safety plan itself was not to be standard 'boilerplate,' but was to be hand-tailored to this particular project. A second reviewer instructed Osborne to delete a paragraph stating "[t]he use of explosives is not allowed. Delete."[14] Among other requirements, the second reviewer also dictated the exact method for safe removal and containerization of certain environmental hazards, instructing Osborne to include this provision in the Plan.[15] These instructions and directives are indicative not of a passive reviewer simply reviewing and possibly 'commenting' or making

---

[11] *Id.*
[12] Government's Brief at 7.
[13] Government's brief at 7; Exhibit 5 at ACE000306, May 14, 2002 *REVIEWER ONE COMMENTS*, paragraph 1; *see also* Exhibit 6 at ACE 000017 for Sandra Kimbrell's March 25, 2002, comments submitted to CoE Quality Control Representative Glenn Zahn and CoE administrator Phil Salmon complaining that the plan contained "canned documents" and that the content of the initial plan "*does not bode well for this project.*" (emphasis added)
[14] Exhibit 5 at May 14, 2002 *REVIEWER TWO COMMENTS*, paragraph 1.A; *see also* Exhibit 6 at ACE 000011 which indicates that these comments came from Glenn Zahn.
[15] Exhibit 5 at paragraph 3.B.

recommendations, but of a reviewer who is actively instructing and dictating the terms of the safety plan to Osborne.

On August 20, 2002, the CoE accepted a new safety plan but again required resubmission, in part, because the plan failed to include EM 385-1-1 in its list of on-site required manuals, but also because parts of the plan were "incomplete and not contract specific."[16]  In addition, among other demands, the CoE instructed Osborne to submit resumes of all principles at the site and in the company; submit a list of all subcontractors who would be working at the site; submit a statement on how Osborne planned to control/coordinate the subcontractors' activities; submit copies of certifications for all employees tasked with providing First Aid/CPR; submit a list of the type and number of all first aid kits and fire extinguishers at the site; submit an Emergency Planning and Evacuation section which referenced EM 385-1-1 page 10 for guidance; and to "modify your site maps to show evacuation routes and evacuation points."[17]  This level of detailed review and required information is another indication of the CoE's level of supervision and involvement in the creation *and implementation* of the site-specific safety plan.  After over six months of review, revisions, instructions and dictation from the CoE to Osborne regarding the plan's specific safety provisions, the CoE eventually approved the safety plan on September 6, 2002, one month after plaintiff's accident.[18]

---

[16] *Id.* at ACE000309, August 20, 2002 REVIEWER ONE COMMENTS, paragraph 3.

[17] Gov. Brief at 8; Exhibit 5 at ACE000309-310.

[18] *Id.*  In its recitation of the "facts" regarding the accident prevention and site safety plan, the government repeatedly refers to the plan as "Osborne's Plan."  This characterization of

The contract also creates an affirmative duty for the CoE to notify the contractor of non-compliance with safety requirements and bestows power on the CoE to stop the work if necessary to ensure corrective action is taken:

> "Whenever the [CoE] becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Governmental personnel, the [CoE] shall notify the Contractor.... If the contractor fails or refuses to take corrective action, the [CoE] may issue an order stopping all or part of the work until satisfactory corrective action has been taken."[19]

It is undisputed that the CoE exercised actual control under this clause of the contract on several occasions. On August 16, 2002, the CoE notified the contractor in writing of the contractor's noncompliance with the safety and accident prevention requirements of the contract.[20] Interestingly, in this letter, rather than simply notifying the contractor of noncompliance, which is all that is required by the contract, the CoE went a step further by taking the initiative to list not less than seven corrective actions which "it is suggested that [Osborne] consider."[21] Then the CoE reminded Osborne that "if you fail to promptly take corrective actions" the CoE may stop work on the project.[22]

Not discussed in the government's brief is a second example of the government's exercise of control over compliance with safety requirements. In a

---

the safety plan is not accepted by plaintiff. Because every aspect of the plan was dictated to Osborne by EM 385-1-1 and the CoE in its approval process, the plan cannot fairly be described as strictly "Osborne's."

[19] Exhibit 2 at page 2 [Section 52.236-13 (d)].

[20] Exhibit 7, Letter from CoE to Osborne Construction Company, dated August 16, 2002.

[21] *Id.* at 2-3.

[22] *Id.* at 3.

letter dated September 26, 2002, shortly *after* approval of the safety plan, the CoE reprimanded Osborne for, among other things, its "failure to assure that a *government accepted project specific accident prevention plan* was in place prior to the start of fieldwork" at the site.[23]  In this letter the CoE says that if Osborne fails to "demonstrate satisfactory safety performance *I will not hesitate to take further steps, in accordance with contract provisions, to assure you provide a safe worksite for your employees and subcontractors.*"[24]    Thus, the CoE makes an explicit statement of its affirmative assumption of a duty *under the contract* to assure a safe worksite for Osborne's employees and subcontractors.

There is no explanation in the letter as to why the CoE, who obviously had full knowledge of the lack of an approved site-specific safety plan prior to the start of fieldwork, blamed Osborne for lack of an approved plan.  As discussed above, the CoE itself dictates the content of the safety plan and controls the approval process. There also is no explanation in the government's brief as to why the CoE allowed the project to proceed for months, even after three "serious reportable accidents" including plaintiff's nearly fatal accident, if there was no approved safety plan in place - especially since the safety plan is required by the contract and EMS 385-1-1.

Just one month later, on October 22, 2002, the CoE's Investigating Officer, Brian West, reported that Phil Salmon, Fairbanks Resident Office Administrative CoE, supplied the answer to this question when he told him that "a number of

---

[23] Exhibit 8, Letter from CoE to Osborne Construction Company, dated September 26, 2002  (emphasis added).
[24] *Id.* (emphasis added)*.*

experienced people including himself had reviewed the plan and thought, that while it needed some corrections and augmentation, it was adequate to allow them to commence work." [25]   Thus, the CoE allowed Osborne to proceed with construction despite the lack of an approved safety plan.

While certain clauses of the contract may state that the contractor shall "superintend" the site, the contract also dictates that "*[a]ll work shall be conducted under the general direction of the Contracting Officer....*" [26]   Glenn Zahn, the CoE's Project Engineer and Quality Assurance Representative, declared that he himself "worked closely" with Osborne, visiting the site *every day* to "discuss issues on the job." [27]   According to his declaration, he met for "as much as three hours" a day with the contractor or its representatives to "resolve any new or ongoing problems and concerns." [28]   Mr. Zahn participated in the pre-construction meeting and reviewed the Accident Prevention Plan. [29] He personally checked "that [the safety plan] addressed every feature of work in [the] contract and hazards normally associated with each feature of work." [30]   Mr. Zahn stated that on his visits to the site he was aware of the presence or absence of safety compliance issues. [31]   Present

---

[25]  Exhibit 9 at p. 9 (CoE Accident Investigator Brian West's "Conversation Records").
[26]  Exhibit 2 at p. 6, Section 52.246-12 (b) (emphasis added).
[27]  Government's Brief, Exhibit I at paragraphs 3 - 4.
[28]  *Id.* at paragraph 4.
[29]  *Id.* at paragraph 3.
[30]  *Id.; see also* Exhibit 6 for certain of Mr. Zahn's e-mails as a reviewer of the safety plan.
[31]  *Id.* at paragraphs 5 and 6.

in his declaration is also the inference that he spoke to the contractor about safety compliance and quality assurance issues at the site.[32]

In addition to the special retention of control over the safety plan and safety compliance, the contract itself also grants the CoE control over the project in a variety of other ways.  Examples include, but are not limited to:

- control over the actual method or manner of performance of the work: "the [CoE] may, at any time...make changes in the work within the general scope of the contract, including changes *...in the method or manner of performance of the work...;*"[33]

- control over the material and workmanship incorporated into the project: "[t]he Contractor shall obtain the [CoE's] *approval of the machinery and mechanical and other equipment* to be incorporated into the work...the contractor shall also obtain the [CoE's] *approval of the material and articles* which the Contractor contemplates incorporating into the work;"[34]

- control over Osborne's employee's: "the CoE may require...that the Contractor *remove from the work any employee* the [CoE] deems incompetent, careless or otherwise objectionable;"[35]

- authority to "*suspend, delay or interrupt all or any part of the work* of this contract for the period of time that the [CoE] determines appropriate for the convenience of the Government;"[36]

- the right to *inspect the project*;[37] and

---

[32] *Id.* Mr. Zahn also states that at the time of the accident he was the "sole government construction representative on the ground for 30 million dollars of contract construction." Id. at paragraph 4.  This statement is not as significant as Mr. Zahn would like it to seem since the Osborne/Fort Wainwright contract accounted for over two-thirds of this amount all by itself.  In fact, the relative magnitude of the Fort Wainwright project may be one of the reasons Mr. Zahn was on site every day for as much as three hours a day supervising the construction.

[33] Exhibit 2 at pages 4 -5 [Section 52.243-4 (a)(2)](emphasis added).

[34] *Id.* at page 1 [Section 52.263-5(b) (emphasis added)].

[35] *Id.* [Section 52.263-5(c)(emphasis added)].

[36] *Id.* at page 4 [Section 52.242-14 (emphasis added)].

- *direction of all quantity surveys.*[38]

### B.    The Accident Prevention Plan

Both the safety plan which was initially rejected in May of 2002 and the final approved September 2002 safety plan contain the same language in regard to fall protection.  Specifically, both plans provide in pertinent part that:

> "Each employee on walking/working surfaces shall be protected from falling though openings to lower levels by the use of a guardrail system, cover or personal fall arrest system."[39] [40]

As the government admits, the plan(s) "*differed from the CoE's EM 385-1-1 manual, which stated that any opening though which a man could fall must be "guarded by a physical barrier or covered"* and *"also differed from the OSHA regulations for guarding floor and wall openings and holes, which states that '[e]very stairway floor opening shall be guarded by a standard railing,' and that '[e]very hatchway and chute floor opening shall be guarded' by a hinged floor*

---

[37] *Id.* at page 6 [52.246-12 (b) (emphasis added)].

[38] *Id.* at page 9 [SCR-17 (b)(emphasis added)].

[39] Exhibit 10 at pp. ACE000096 and ACE000611 at Fall Protection, paragraph 3.  As can be seen from the CoE's handwritten notations on these documents, the May 2002 plan was originally submitted in March 2002 and the September 2002 plan was originally submitted in August 2002.

[40] Inexplicably, the government's brief quotes  the section of the safety plan pertaining to "employees working near a leading edge six feet or more above a lower level" rather than the section quoted above which pertains to falling through openings on walking/working surfaces. Government's Brief at 8.  While OSHA requires different accident prevention methods for each situation, both sections of the safety plan require the same fall protection and allow for any one of three alternative systems.  Ironically, it is this exact flaw which led to plaintiff's accident.

*opening cover or removable railing*.'   Neither EM 385-1-1 nor [OSHA] allowed the option of using a personal fall arrest in place of a physical barrier, but the …Plan allowed this option."[41] In other words, both plans violated EMS 385-1-1 and OSHA regulations.

Mr. Zahn stated in his declaration that he did not know why the safety plan was approved with a deviation from EM 385-1-1 "but as I recall, it was already summer with a lot of projects starting or already underway."[42]   Notes from a conversation record between Brian West, the CoE's Investigating Officer for plaintiff's accident, and Phil Salmon, a Contracting Officer from the CoE's Fairbanks Resident Office indicate simply that the deviation "was not noticed.   This level of detail would require the Contractor to basically submit EM 385-1-1 in toto for review."

C.    The Accident and Investigations

On August 5, 2002, plaintiff, a carpenter employed by Osborne on the wall-framing crew, was waiting for his partner to finish rigging a wall section to be picked and put into place.   Plaintiff asked his supervisor for something to do while waiting.   The supervisor told plaintiff to help snap lines on the 2nd floor deck.   When finished snapping lines the supervisor told plaintiff to pull up the Miller clips (one use fall protection anchors) on the 2nd floor deck because they were in the way of where the

---

[41] Government's Brief at 8-9 (emphasis added).
[42] Government's Brief, Exhibit I at paragraph 3.

walls would stand.  Plaintiff, wearing his fall protection harness, lanyard and snap, began pulling up the anchors.[43]

At the time of the accident, plaintiff was removing fall protection anchors from around a second floor stairway opening, approximately 6.5 feet x 9.5 feet in size, so that wall partitions could be installed on the second floor deck.[44]  The opening was not covered or barricaded as required by EM 385-1-1 or OSHA regulation 29 CFR Sec. 1910.23.  At approximately 9:15 AM, an Osborne employee looked through the second floor stairway opening and saw plaintiff lying injured in a pool of blood on the concrete basement floor, approximately 18.5 feet below.[45]  Although no one witnessed the fall, evidence indicates that plaintiff fell through the second floor opening, down through a first floor stairway opening and onto a keg of nails on the basement floor. Plaintiff sustained life-threatening injuries, including a broken back, collapsed lung and fractured skull.[46]

---

[43] For the statements contained in this paragraph *see* Exhibit 11, OSHA Accident Investigation Report at 17; Exhibit 9 at 4.

[44] Exhibit 11 at 23; *see generally*, Exhibit 12 (document dated August 5, 2002, regarding notes of Joel Wallender's "Accident Fall From Height"); Exhibit 13 (November 4, 2002, Memorandum for CEPOA-OC (Col Perrenot) and attached Report of Proceedings by Investigating Officer/Board of Officers dated October 22, 2002, regarding Joel Wallender's accident; Exhibit 14 (CoE accident investigation photographs at ACE000641, 642, 648, 649, 656, 666, 668); and Exhibit 15 (CoE September 2002 Board of Investigation Report and photographs attached thereto).

[45] *See* Exhibit 14 at ACE000641 and 000668 (note: no stairs had been constructed yet at either the 2nd floor or 1st floor stairway openings).

[46] The exact nature of plaintiff's injuries can be described as: multiple thoracic fractures with paraplegia (blow out fracture at T-12); L-3 fracture; head injury with bifrontal hemorrhagic contusions; respiratory failure with bilateral pulmonary infiltrates and pneumonia; bilateral hemopnuemothoraces; left scapular fracture; rib fractures left T-10,T-11,T-12; and scalp lacerations.  *See* Exhibit 16 (Liberty Northwest six-page facsimile to Cynthia Balser dated August 17, 2003 regarding Joel Wallender's injuries.)

Due to plaintiff's severe head injury, he cannot remember much about the accident, falling or being injured.[47]  He remembers being told by the supervisor to go over and remove some of the fall protection anchors.  He remembers removing the anchors and wondering why they were so close to the edge of the opening.  He also remembers that there was no barricade around the hole and that he does not know why that was the case.  The next thing he remembers is waking up in the hospital.[48]

OSHA and the CoE conducted separate investigations into the accident.  The September 2002 OSHA Investigative report initially noted that "[a]lthough [plaintiff] was wearing full-body harness and lanyard, it is not clear whether [he] was tied off or not.  Anchor on 2nd floor deck was partially pulled out of the decking.  No other personnel witnessed the accident.  Other anchors in immediate vicinity of stairwell appeared to be intact."[49]  Many of the employees that worked with the plaintiff at the site stated that he was one of the safest employees on the deck and that he was always telling the other employees to get attached, or telling them the proper and safe way to do things.[50]  The report also states that "[w]hen the victim was found, he was still wearing his harness and lanyard.  The medics that responded cut the body harness from the victim's body."[51]

---

[47] Exhibit 9 at p. 4.
[48] *Id.*
[49] Exhibit 11 at p. 16.
[50] *Id.* at p.23, paragraph 9
[51] *Id.* at p. 23, paragraph 2.

Though there were no eye witnesses to the accident other than the plaintiff himself, OSHA describes the position of the anchor the plaintiff apparently was removing at the time of the accident and theorizes as to the sequence of events leading up to the accident:

> "The clip was located towards the front of the building [south] about 3' from the edge.  The clip is also toward the front inside corner and about 1' from the edge.  The stairwell opening is about 7' back [from the] front of building.  [South] & [North] sides of stairwell opening are 6'6", [East] and [West] are 9'6" back to front of building.  The victim apparently stood on the deck between the outside edge and the inside stairwell opening.  As he was bent over to drive the hammers claws into and under the clip and then pull up the nails or pull the clip up, it appears that he lunged backwards and fell through the opening after the clip or nails gave way.  The clip was bent towards the opening suggesting that the force was heading towards him and the stairwell behind.   I don't think anyone will know for sure what actually happened, unless the victims memory of the events come[s] back."[52]

The lack of a cover or barricade around the floor opening was an OSHA violation.[53]

OSHA's "Investigative Summary" denotes the type of inspection as "Fatality/Catastrophe;" the scope of investigation as "Comprehensive;" and the classification of the inspection as "Safety Planning Guide/Construction."[54]   The "source of the injury" is recorded as the "working surface" and the "environmental factor" as the "working surface or facility layout condition."[55]  When asked "[d]id a violation of a regulation, code, or standard cause or contribute to this accident?"

---

[52] *Id.* at p. 23, paragraph 6; Exhibit 14 at ACE000642.
[53] 29 CFR Sec. 1910.23; Government's Brief at 8-9.
[54] Exhibit 11 at p. 20
[55] *Id.* at 18.

the OSHA investigator checked the box marked "YES."[56]  The report also suggests a "human factor" of "misjudgment of hazardous situation" but does not say who misjudged the situation, i.e. the plaintiff, the employer or someone else.[57]  There are other notes that the task itself was "not regularly assigned"[58]and that plaintiff had been on the job for 1 ½ weeks at the time of the accident.[59]

The CoE's Investigating Officer's Report ("the CoE report"), initiated after the OSHA report, was begun on October 4, 2002, and completed on October 22, 2002.[60]  The CoE' report is substantially similar to the OSHA findings presented above with the following exceptions:

> (a) the CoE report specifically finds that the fall protection anchors were not installed properly as they were not at least 6 feet from the edge of the opening;
>
> (b) the CoE report faults Phil Salmon and others from the CoE Fairbanks office for failing to ensure that the Plan met the requirements of EM 385-1-1;[61]
>
> (c) the CoE report finds that the Plan should not have been approved without including the requirement for covering or barricading openings as required by EM 385-1-1;

---

[56] *Id.* at p. 16 part 43.
[57] *Id.*
[58] *Id.*
[59] *Id.* at p. 23.  The government suggests that plaintiff attended a February 14, 2002 orientation program for all employees working on the Fort Wainwright Project and signed an orientation form acknowledging that he received, read, understood, and agreed to the safety policies.  Government's Brief at pp. 9-10.  In fact, the exhibit provided by the government attaches an acknowledgement signed on July 24, 2002, just two weeks before his accident. (ACE000274)  The government has presented no evidence that Mr. Wallender was working on the site or attended any orientation meetings in February 2002.
[60] Exhibit 13 at ACE000219, Section II.
[61] N.B.  The OSHA violation was not mentioned in the CoE's findings, perhaps because EM 385-1-1 and OSHA both require the same fall protection – a physical barrier or cover – over floor openings.

(d) rather than finding that the unprotected hole in the work surface was the cause of the accident, the CoE report speculates that plaintiff was not tied off and that plaintiff's failure to tie off to the improperly installed anchors around the edge of the opening caused the accident;

(e) the improper installation of the anchors was found to be a "contributing factor;" and

(f) the failure to cover or barricade the floor opening and resultant violations of both EM 385-1-1 and OSHA regulations were not mentioned by the CoE in regard to causation.[62]

Significantly, despite its finding that the "proximate cause" of the accident was plaintiff's alleged failure to "tie off," the CoE's report does <u>not</u> recommend more vigilant safety harness training or supervision of the use of safety harnesses.[63] Rather, the CoE recommends that "[t]he fall protection plan should be updated to require the use of guardrails or covers regardless of whether or not personnel are tied off" and "[w]hen reviewing contractor safety plans, the plans should be reviewed for strict conformance with [EM 385-1-1].    Individuals responsible for approving safety plans should review the requirements of EM 385-1-1 and require compliance before approving contractor safety plan.  Fall Protection Plans allowing for either guardrails OR personal fall arrest systems should be disapproved."[64]

A document not mentioned or attached to the Government's Brief is a CoE document entitled "Safety Lessons Learned" dated September 10, 2002 and affixed

---

[62] Exhibit 13 at ACE000221, Section IV.
[63] In this regard, *see* Exhibit 14 at ACE000656, a photograph of CoE accident investigators standing and kneeling around the unprotected floor opening at the scene of plaintiff's accident on August 5, 2002.  (None are wearing safety harnesses.)
[64] Exhibit 13 at ACE000221 at Section V.

with the CoE's preparer Dennis W. Mitchell's initials "DWM."[65]   Rather than blaming

the plaintiff for not being "tied off," the "Lessons Learned" focuses on the true

cause of the accident – the failure of the CoE to require that the floor opening be

barricaded or covered.   This document is significant as it contains the following

admission by the CoE:

> "Floor and wall holes and openings pose a substantial hazard and are
> the subject of their own Section 24 of EM 385-1-1.   *On Corps jobs,
> openings in floors __must__ be covered or barricaded.   Use of personal fall
> protection to mitigate this hazard is not an acceptable alternative.
> This is in keeping with the preferred use of engineering and solutions
> to hazards ahead of using personal protective equipment (PPE).   Note
> that Section 24 is not cited in the EM 385-1-1 Index under Fall
> protection nor referenced in the fall protection sections.   Reviewers
> must make a special effort to assure that this requirement is properly
> covered in contractor fall protection plans and implemented in the
> field.*
>
> ***
>
> In conclusion, Government reviewers must assure that proper review
> and acceptance of contractor fall protection plans are accomplished
> and include covering or barricading floor openings if they are present
> on the project.   Government Quality Assurance representatives should
> become familiar with their contractors' fall protection plan and the
> manufacturer's instructions for use of the fall protection PPE being
> used on the jobsite.   Fall protection equipment should be checked to
> assure it is being installed, used and removed correctly in accordance
> with manufacturer's instructions."[66]

---

[65] Exhibit 17, "Safety Lessons Learned," Alaska District Pacific Ocean Division, U.S. Army
Corps of Engineers, prepared by Dennis W. Mitchell, dated September 10, 2002; *see also*
Exhibit 18 (D. Mitchell e-mail to T. Novak dated September 6, 2002 requesting copies of
the original safety plan and reviewer's comments).

[66] Exhibit 17 at p. 2 (emphasis added).  The CoE also notes that the personal fall
protective equipment was not installed or used properly and that "[a]lthough this did not
contribute to this accident...had the carpenter fallen while hooked up this way the anchor
would have been subjected to higher than anticipated loading."  Id. at p. 2, paragraph 2.
In other words, the anchor may not have held or prevented the fall or injury.

Aside from the admission that "[u]se of personal fall protection to mitigate this hazard is not an acceptable alternative," these admissions are particularly significant because they indicate that the CoE instructed Osborne to strictly comply with the CoE's admittedly confusing and inconsistent document (EM 385-1-1) when preparing its Fall Protection Plan, and then failed to ensure that proper fall protection provisions were included in the safety plan.

As the reviewer states, EM 385-1-1's fall protection section (Section 21) does not include the OSHA mandated cover or barricade over floor openings and there is no cross-reference to Section 24's similar requirement. Thus, the CoE's reviewers must make "a special effort" to make sure the floor covering requirement is included in contractor fall protection plans. If even the CoE has difficulty navigating its own safety manual and fall protection requirements, the contractor also is faced with similar or even greater difficulties in fulfilling its contractual duty to comply with EM 385-1-1. "Lessons Learned" is an admission by the CoE that the CoE's instructions to Osborne to comply with EM 385-1-1's fall protection provisions probably caused or contributed to this crucial omission in Osborne's Fall Protection Plan and the accident which caused plaintiff's injuries.[67]

---

[67] Interestingly, the section of Osborne's plan which addresses fall protection is "Section 21," the same section number as EM 385-1-1, suggesting that Osborne did strictly follow EM 385-1-1's format and for this reason may have missed Section 24's requirement of a cover or barricade - the exact error of which the CoE's reviewer warns. In addition, as noted above, the CoE remarked on several occasions its observation that Osborne appeared to be using "canned documents" and following 'format rather than content.' The CoE's knowledge of this fact should have increased the scrutiny of the safety plan's provisions.

In addition, "Safety Lessons Learned" states that CoE safety plan reviewers, such as Glenn Zahn and Phil Salmon, have a duty to ensure (a) that "proper review and acceptance of contractor fall protection plans are accomplished" and (b) that those plans "include covering or barricading floor openings if they are present on the project." "Safety Lessons Learned" also essentially admits that Glenn Zahn, the Quality Assurance Representative present at the construction site *every day*, should have been "familiar with the contractors' fall protection plan and the manufacturer's instructions for use of the personal fall protection equipment being used on the jobsite." Specifically, the CoE admits that "[f]all protection equipment should be checked to assure it is being installed, used and removed correctly in accordance with manufacturer's instructions."

### D.    Plaintiff's Complaint

Plaintiff sustained severe, life threatening injuries. He is a permanent paraplegic confined to a wheelchair for the rest of his life. Although he is fairly independent he remains unemployed and daily endures severe and exquisite pain in the immobile portion of his body – from his chest and lower trunk down through his lower extremities.[68] After completing the required administrative claim process against the government in June 2005, plaintiff filed his complaint against the U.S. Army Corps of Engineers on November 9, 2005.

Plaintiff's complaint alleges the same general set of facts as presented above, namely that plaintiff fell through an unprotected floor opening at the site and that

---

[68] *See generally* Exhibit 16.

the floor opening was not covered due to the CoE's failure to approve and implement a proper safety and fall protection plan at the site.  Specifically, the complaint states in pertinent part that:

16.   The failure of the government to ensure that a proper safety plan was in place, one that required covering or barricading openings, caused Mr. Wallender's injuries....

18.   Defendant CoE knew or should have known of the area where Mr. Wallender fell and of the danger it posed.  In spite of knowledge or reason to know and [in] spite of their duty to exercise care on behalf of individuals on the job site, defendant failed to take appropriate measures to safeguard Mr. Wallender and others like him or provide adequate warnings about the dangers or take other preventative measures.

19.   In the absence of such preventable measures, accidents and injuries such as those suffered by the plaintiff were foreseeable....

20.   As the operator and owner of the premises, defendants had a duty to exercise due care to take preventative measures to remedy or prevent dangerous conditions.

21.  Defendants breached their duty and were negligent by among other things:

(a)   failing to warn plaintiff and others of the dangerous condition;
***

(d)   failing to adequately inspect and maintain the area;
(e)   failing to properly block or barricade the area as required;
(f)   failing to ensure that a proper safety plan was in place, one that required covering or barricading openings;
(g)   improperly or negligently approving the Osborne safety plan without including the requirement for covering or barricading openings as required by EM 385-1-1;
***

(i)   In other respects to be proven with more specificity at        trial.

22.    As a direct and proximate result of the negligence of CoE, Mr.
       Wallender sustained ...injuries.

## III.  ANALYSIS

### A.    PLAINTIFF HAS ASSERTED A VALID CLAIM UNDER THE FEDERAL TORT CLAIMS ACT

This court has "exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the Unites States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[69]  The government's contention that plaintiff's complaint asserts nothing more than a breach of contract claim, and that therefore this court lacks jurisdiction, has no merit.

By stating that the CoE negligently fulfilled its assumed duties with respect to safety, plaintiff does not suggest that the CoE merely breached a contractual agreement.  As will be discussed further in subsequent sections, the contract between the CoE and Osborne is evidence of the CoE's voluntary assumption of duties to plaintiff as well as the CoE's retained control over the independent

---

[69] 28 USCA 1346(b); 2674 ("The United States shall be liable, respecting provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.")

contractor's actions.[70]   Alaska tort law holds that "a defendant who 'retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety,' has retained sufficient control to be held liable if he negligently exercises that control."[71]

The cases cited in Section I of the government's brief, do not apply to the case at bar.   Most of these cases stand for the general proposition that if the contract imposes the duty in question, rather than the law, then the claim is based in contract.[72]   As discussed above, the plaintiff is not suing the government to enforce a contractual promise; rather, the plaintiff is suing the government for its negligence in regard to a duty imposed by Alaska tort law.

Among the government's cases, only *Littlefield* and *Woodbury*[73] specifically address claims brought under the FTCA.   In *Littlefield*, the Ninth Circuit, applying Nevada tort law, held:

> "Littlefield's contention that the government is independently liable seems to ignore that *this action was brought under the Federal Tort Claims Act, and that under that statute the federal government is liable only to the same extent that an individual may be held liable under the tort law of the state where the act or omission occurred.*  28

---

[70] Alaska courts also have held that "there is a common law duty to provide a safe worksite running to whomever supplies and controls that worksite.  This duty protects all workers on the site and not just the employees of the defendant.  The duty is not dependent upon the existence of any particular combination of contractual relationships." *Parker Drilling Co. v. O'Neill 674 P.2d 770,* 776; *see also, id.* at 775 ("...this court has demonstrated a dissatisfaction with strict privity limitations in resolving questions of jobsite liability.")

[71] *Parker Drilling Co. v. O'Neill*, 674 P.2d at 776 (Alaska 1983) *citing Moloso v. State*, 644 P.2d 205, 211 (Alaska 1982), *et al.*

[72] *See generally,* Government's Brief at 14 for discussion re: *K&K Recycling, Transamerica Premier Ins. Co., and Alaska Pac Ins. Co.*

[73] 927 F.2d 1099 (9th Cir. 1991) and 313 F.2d 291 (9th Cir. 1963) respectively.

U.S.C. §§ 3674 and 1346 (b).  *Here that state is Nevada.  Thus, the relevant issue is whether Nevada law recognizes a duty under tort law owed by the landowner to an independent contractor's employee, the breach of which constitutes negligence.*  The highest court of that state has addressed this precise issue.  Under the teachings of *Rinehart*, Nevada has opted to interpret the "risk of physical harm to others" as set forth in Sections 413 and 416 of the Restatement not to include risk of physical harm to employees of an independent contract (citation omitted).

...Clearly, the government had the right to stop construction in the presence of some safety violation.  But that simply was a right conferred upon it by the contract, a right that could be enforced under the law of contracts.  Under the circumstances at bar, this right does not become an obligation or duty *under Nevada tort law*, the breach of which would impose liability.  We may not mix tort apples with contract oranges."[74]

Although *Littlefield's* holding regarding the existence of a Nevada tort law duty does not apply here, *Littlefield* is instructive in that the Ninth Circuit properly framed the inquiry for this court as 'whether or not *Alaska* "recognizes a duty under tort law owed by the landowner to an independent contractor's employee, the breach of which constitutes negligence."'

In answer to this question, the government simplistically contends that "there is no common law duty or statutory duty in Alaska that requires an employer of an independent contractor to review an Accident Prevention Plan."[1]  Plaintiff makes no claim that there is such a duty under Alaska tort law.  Rather, plaintiff claims that the government assumed affirmative duties with respect to safety and retained control of the right to direct the manner of the independent contractor's performance.  Since Alaska tort law follows the assumption of affirmative duty and

---

[74] *Littlefield* 927 F.2d at 1104 (emphasis added).

retained control doctrines, as briefly described above and as will be discussed more fully below, the answer in our case is clearly "yes" – Alaska tort law does recognize such a duty.[75]

In *Woodbury,* a contractor brought a claim against the government under the FTCA alleging that the government breached its fiduciary duty to provide financing under the National Housing Act.   The Ninth Circuit affirmed the dismissal of the claim under the FTCA because the contractor's claim was governed exclusively by the Tucker Act, another federal statute.[76]   *Woodbury* is clearly distinguishable. Nothing about the facts, the issues presented or the holding of this case remotely applies here.   The plaintiff in *Woodbury* defaulted on a government construction loan.   When the government foreclosed on the property, the plaintiff sued for breach of fiduciary duty because the government had promised to provide financing. The breach of contract claim and jurisdiction of the Court of Claims under the Tucker Act in this narrow instance has no application to our case.

As discussed fully below, under *Moloso* and its progeny, Alaska recognizes a duty under tort law owed by the landowner to an independent contractor's employee, the breach of which constitutes negligence.   As plaintiff has presented a claim recognized under Alaska tort law, this court has exclusive jurisdiction under the FTCA.

---

[75] The government essentially concedes this point.  Government's Brief at 17-18.

[76] *Woodbury*, 313 F.2d at 295-96 *discussing* Tucker Act, 28 U.S.C. §1491 (conferring jurisdiction upon the Court of Claims over "any claim against the United States...founded...upon any express or implied contract with the United States...in cases not sounding in tort.")

B.     THE CoE ASSUMED AFFIRMATIVE DUTIES WITH RESPECT TO SAFETY AND
       RETAINED CONTROL OVER OSBORNE'S PERFORMANCE CREATING A DUTY
       UNDER ALASKA TORT LAW TO ENSURE THE SAFETY OF OSBORNE'S
       EMPLOYEES

"In general, the employer of an independent contractor owes no duty to the
independent contractor's employees to protect them from the negligence of
the employees' own master.  On the other hand, the employer of the
independent contractor does owe to these servants the duty to avoid
endangering them by the employer's own negligent actions or omissions.  As
an example of this duty, the 'retained control' theory of recover is set forth
in Restatement (Second) of Torts §414 (1965) and has been expressly adopted
by this court. N3 Section 414 provides:

"Negligence in Exercising Control Retained By Employer, One who
entrusts work to an independent contractor, but who retains control of
any part of the work, is subject to liability for physical harm to others
for whose safety the employer owes a duty to exercise reasonable care,
which is caused by his failure to exercise his control with reasonable
care."[77]

Under *Moloso*, if the CoE as the employer of Osborne retained sufficient control over

the construction project, it should be responsible for all harmful consequences of its

*own* negligent exercise of that control.[78]  "To determine whether the nature and

extent of the control present is sufficient to impose liability, both the contractual

---

[77] *Moloso,* 644 P.2d at 210-11 (citations omitted).  With regard to the analytical similarity
between the retention of control theory and the assumption of duty theory *see Moloso* at
212 *citing Hammond v. Bechtel,* 606 P.2d 1269, 1277 n. 14 & 15 (Alaska 1980)("'It is
ancient learning that one who assumes to act, even though gratuitously , may thereby
become subject to the duty of acting carefully....' The concept of voluntary assumption of a
duty has long been recognized in Alaska...."

[78] *See Moloso,* 644 P.2d at 211, n.5 ("Section 414 is sometimes referred to as an
"exception" to the general rule that the employer of an independent contractor is not liable
for injuries sustained by the employees of that independent contractor.  Calling it an
"exception, however, appears to be nothing more than a circuitous route around the
simple rule that anyone, including an employer of an independent contractor, may be held
liable for his or her *own* negligence.")

provisions and the actual exercise of control are relevant."[79]    An examination of both the contract and the CoE's actual exercise of control establish that the CoE retained sufficient control over the construction project to render it liable for its own negligent exercise of that control.

"It is normally a question of fact for the jury to determine whether an employer of an independent contractor has retained sufficient control so as to make the employer liable."[80]    The government urges the court to take this crucial question of fact away from the jury.  The government's argument is based almost exclusively on the Ninth Circuit's holdings in *Petranovich*.[81]    *Petranovich* is plainly distinguishable and does not control the outcome of this case.

C.    PETRANOVICH IS NOT CONTROLLING AS PLAINTIFF HAS    PRESENTED COMPELLING EVIDENCE OF THE COE'S RETAINED CONTROL AND AFFIRMATIVE ASSUMPTION OF DUTIES IN REGARD TO SAFETY AT THE SITE

The plaintiff in *Petranovich* was an experienced electrician and the foreman of a four-man electrical crew employed by an independent contractor hired by Matanuska Electrical Association (MEA), the owner of some power lines, to install additional utility poles.  The plaintiff was electrocuted while installing the poles and sued MEA arguing that it had retained control over his actions.  The Ninth Circuit found that, at the time of the accident, the plaintiff was working for an independent

---

[79] *Id.* at 211; *see also Petranovich v. Matanuska Electric Assn.,* 22 P.3d 451, 454 (Alaska 2001) *citing Moloso.*
[80] *Moloso,* 644 P. 2d at 212 *citing Everette,* 614 P.2d at 1347 and *Hobbs v. Mobil Oil Corp.,* 445 P.2d 933, 935 (Alaska 1968).
[81] Government's Brief at 18-23.

contractor, was free to choose his own methods for doing the job and Mea did not retain direct control over his work.   Therefore, the Ninth Circuit held that, as a matter of law, MEA was not responsible for Petranovich's acts and granted summary judgment for MEA.  *Petranovich* is distinguishable on a variety of grounds.

First, after MEA filed a motion for summary judgment, the plaintiff cross-moved for summary judgment in his favor.   Noting that the question of retained control is normally a question of fact for the jury, the Ninth Circuit observed that the plaintiff conceded that MEA did not exercise any actual control over the work while it was being done and "[t]o support his claim that MEA retained the right to control his work, [the plaintiff] relies solely on the terms of the contract.   Since interpretation of the terms of a contract is an issue of law for the court, this issue is ripe for summary judgment."[82]   As discussed above at length, in our case, plaintiff contends that the CoE did exercise actual control and is not relying solely on contractual terms to support his claim.   "Both contractual provisions relating to control and the actual exercise of control are relevant in determining whether the nature and extent of the retained control is sufficient to warrant imposition of liability."[83]   Thus, this court is not free in this case to take the question of fact as to "retained control" away from the jury.

---

[82] *Petranovich,* 22 P.3d at 454.   The plaintiff in *Petranovich* also did not dispute the findings from the accident investigations.

[83] *Dahle v. Atlantic Richfield Company*, 725 P.2d 1069, 1072 (Alaska 1986) *citing Moloso,* 644 P. 2d at 211.

Second, *Petranovich* is distinguishable because there the employer assumed no affirmative safety duties under the contract and never exercised any actual control over the method of performance.[84]  In stark contrast, in our case:

- The CoE provided more than just 'recommendations,' 'suggestions' or 'guidelines' regarding safety or job performance, the CoE dictated strict compliance with its own safety requirements and affirmatively assumed a *'special item'* contractual duty to review and approve the site-specific safety plan to ensure that it provided proper safety protection for Osborne's employees.  In furtherance of its duty, over the course of a six month approval process, the CoE required numerous revisions and resubmissions, in several instances dictating the exact provisions of the safety plan, before granting final approval;[85]

- In *Petranovich*, the contract was silent regarding the process of attaching the energized power lines leaving the independent contractor free to choose his own method.  In addition, the employer exercised no right to oversee the independent contractor's choice.  Here, however, the CoE dictated the specific safety methods to be used at the site and exercised it's right to supervise, oversee and approve the very fall protection methods which led to the plaintiff's injuries;

- The CoE retained control over "the general direction" of the project and placed Glenn Zahn, a Project Engineer/Quality Assurance Representative on site to ensure compliance with the contract and the safety plan, and to resolve problems *on a <u>daily</u> basis*.  Mr. Zahn reviewed the safety plan and was

---

[84] *Petranovich,* 22 P.3d at 455 ("There is nothing in the contract that suggests that MEA would retain control over safety matters, or provide supervision or safety inspection, or assume any affirmative duties in this regard.")

[85] *E.g.*, our case is factually distinguishable from *State v. Morris*, 555 P.2d 1216, 1220 (Alaska 1979) where the court held that "the state merely retained a right to supervise with respect to safety, but did not contractually impose a duty on itself to do so" (citations omitted).  In our case, the CoE contractually imposed a duty on itself to do so, and did in fact exercise its control under the special approval provision.  However, it also may well be that under the peculiar facts of this case, where the CoE admits that the fall protection provisions of EM 385-1-1 are deficient in that they fail to reference Section 24 of the plan (or by implication OSHA regulations) which require a barricade or cover over floor openings, the CoE's requirement of strict compliance with its own safety manual, an admittedly confusing and deficient text, may be evidence enough of retained control the negligent exercise of which is sufficient to impose liability.  *See, e.g.,* discussion above at pp. 17-18.

familiar with its contents as well as the provisions of EM 385-1-1.  As part of his duties, Mr. Zahn admitted that it was his practice on this and other sites to be aware of safety compliance issues and that he reported noncompliance and other safety issues to Osborne, as required by the contract.  Also present in his declaration is the inference that it was his practice to speak directly to independent contractors' employees when he felt it necessary to protect their safety;[86]

- The CoE exercised its control under other safety provisions of the contract to notify Osborne of safety compliance issues and affirmatively assumed the duty to suggest corrective actions;

- The CoE itself stated its clear affirmative assumption of a duty in regard to the safety of Osborne's employees when it said: "*I will not hesitate to take further steps, in accordance with contract provisions, to assure you provide a safe worksite for your employees and subcontractors.*"[87]

- The reasons for the "independent contractor rule" do not apply to this case as the CoE had the right to control the manner in which the work was to be done through the supervision, creation and approval of the safety plan and its implementation, and did actually exercise that control.[88]

Under the facts of the case as discussed in greater detail above, the government's assertions that "nothing in the contract suggests that CoE would retain control over safety matters, provide supervision or assume any affirmative safety

---

[86] *E.g.*, our case is clearly distinguishable from *Chaffin v. United States*, 176 F.3d 1208, 1212 (9th Cir. 1999) where the government "assumed no responsibility for supervising the site under the contract and only inspected the site semiannually."

[87] Exhibit 8 (emphasis added).

[88] "This 'exception' to the independent contractor rule simply defines a generic situation in which liability is imposed on the employer or general contractor for its own negligence, not that of the independent contractor.  As Dean Prosser said: '[v]arious reasons have been advanced for...[the independent contractor rule], but the one most commonly accepted is that, since the employer has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and administering and distributing it.'"  *Hammond v. Bechtel*, 606 P.2d at 1274, fn. 7.

duties" and "it never assumed an affirmative duty or directed a specific method of safety performance"[89] are plainly disingenuous.

It is also disingenuous and overly simplistic for the government to state that as "every relevant contractual provisions (sic) made Osborne responsible for day-to-day construction operations and safety, the CoE did not retain sufficient control to assume liability for Mr. Wallender's accident."[90]  The CoE's control over the site-specific safety plan dictated the exact method and manner of Osborne's performance in regard to safety at the site, including fall protection.  By negligently supervising the creation of, and ultimately approving, a site-specific safety plan which allowed Osborne to choose between three methods of fall protection for employees working around floor openings, the CoE created an untenable and unsafe plan which violated state and federal OSHA regulations.   In addition, the CoE's retention of "general direction" of the project and oversight of safety compliance via the contract as well as Mr. Zahn's daily presence and affirmative actions at the site is also compelling evidence of the CoE's direct daily exercise of control and supervision at the site.

At the very least, whether the CoE retained sufficient control over the safety aspects of the project as to be liable for a failure to properly exercise that control is a question for the jury.   The court in *Hammond v. Bechtel*[91] found *Pasko v.*

---

[89] Government's Brief at 20.
[90] Government's Brief at 21.

[91] 606 P.2d 1269 (Alaska 1980).

*Commonwealth Edison Co.*, 302 N.E. 2d 642 (Ill. App. 1973) persuasive in this regard.[92]  In *Pasko* the court found that the:

> Defendant could order the work halted if it felt that unsafe procedures were being followed, and could prevent the work from being resumed until, in its opinion, proper means and methods were employed to avoid injury or property damage.  Defendant could order that any of ....[the independent contractor's] equipment be removed from the jobsite, if , in its opinion, such equipment was unsafe or inadequate....It was , at the very minimum, a question of fact for the jury as to whether the defendant had retained sufficient control over the safety aspects of the project as to be liable for a failure to properly exercise that control."[93]

Similarly, a question of fact is presented here as to the CoE's failure to properly exercise its retained control over the safety procedures employed at the site.

### D.    PLAINTIFF HAS PRESENTED FACTS IN SUPPORT OF HIS CLAIM CLAIM WHICH WOULD ENTITLE HIM TO RELIEF

A complaint should not be dismissed under Rule 12(b) (6) "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[94]  On a motion to dismiss, the court accepts the facts alleged in the complaint as true.[95]  The allegations contained in plaintiff's complaint establish a claim for negligence under Alaska tort law as plaintiff has alleged that

---

[92] Id. at 1276.

[93] Pasko, 301 N.E.2d at 648-49.

[94] Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) *citing* Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Rodriguez v. Panayiotou, 314 F.3d 979, 983  (9th Cir. 2002) (reversing dismissal) *citing* Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002);  Vignolo v. Miller, 120 F.3d 1075, 1077  (9th Cir. 1997) (reversing dismissal) *citing Parks School of Business v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).

[95] Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) *citing* Shah v. County of Los Angeles, 797 F.2d 743, 745 (9th Cir. 1986).

the government assumed an affirmative duty to approve the safety plan for the site and exercised this control over the safety plan in a negligent manner, which negligence directly and proximately resulted in plaintiff's injuries.

Plaintiff has presented facts in support of his claim which would entitle him to relief under Alaska tort law as stated in *Moloso* and its progeny. The facts presented in the complaint and as set forth above establish that by assuming affirmative duties with respect to safety the CoE retained sufficient control to be held liable if he negligently exercised that control. Specifically, the CoE did not simply 'reserve the right' to 'review' the safety plan before it was implemented. Under the contract, the CoE assumed the special duty to "approve" the site-specific safety plan. The provision requiring the CoE's approval was not a boilerplate provision, but a "special item" added to this particular contract for this particular project.

Plaintiff has presented ample evidence, and the CoE does not dispute , that the CoE actually exercised its duty under the special approval provision by supervising the creation of the safety plan, instructing and dictating specific terms of the plan to Osborne, reviewing and editing the plan, rejecting the plan and requiring resubmission, and eventually accepting and approving the plan. Far from reviewing and rubberstamping a generic safety plan as a mere formality prior to the start of construction, the CoE engaged in over six months of review, revisions, instructions and dictation to Osborne regarding the plan's specific safety provisions as they pertained to this particular project. The CoE acted not as a passive 'reviewer' but as an active participant in the creation of the safety plan,

aggressively exercising its ultimate control and authority to supervise, instruct and dictate the proper safety procedures to be implemented at the construction site.

As part of the safety plan creation process, the CoE instructed Osborne to comply with the provisions of EM 385-1-1. By the CoE's admission, EM 385-1-1's Section 21 "fall protection" provisions are deficient and confusing and do not reference the OSHA or EM 385-1-1 requirement that all floor openings be barricaded or covered. Rather, EM 385-1-1's fall protection provisions emphasize alternative methods of fall protection with equal attention given to personal fall arrest systems or safety harnesses.

By not covering or barricading the floor opening, Osborne did not violate the safety plan approved by the CoE. Rather, the safety plan as approved by the CoE - by providing that a personal fall arrest system was an acceptable alternative to barricading or covering floor openings - violated OSHA standards and was not in compliance with the preferred use of engineering solutions to hazards ahead of using personal protective equipment. As the CoE admitted after the accident: "use of personal fall protection to mitigate this hazard is not an acceptable alternative."[96]

The CoE was on notice from the start of the safety plan approval process that Osborne was using "canned documents," was following the format rather than the content of EM 385-1-1, and was not creating a site-specific safety plan.[97] The content of the initial safety plan was so deficient that one reviewer ominously noted

---

[96] Exhibit 17 ("Lessons Learned") at p. 2, paragraph 1.
[97] *See above* at pp. 3-5.

"[t]his does not bode well for this project."[98]   Despite the reviewer's warning, the CoE admits that it failed to properly exercise its control over the safety procedures to be employed at the site - specifically to correct the OSHA and other violations in the safety plan which led to the plaintiff's near-fatal accident.[99]   Instead, the CoE allowed the work to go forward without an approved safety plan in place, and even failed to correct the OSHA violations in the fall protection provisions of the safety plan which it eventually approved a month after plaintiff's accident.

These circumstances are directly analogous to those presented in *Moloso*. There, the employer (the State of Alaska) became aware of a safety hazard and stopped work on a road construction project being conducted by an independent contractor.   Then, after a series of meetings, the employer overruled its own decision and ordered the work to resume.   As a result of its negligent decision to resume work, two of the independent contractor's employees were killed. The employer was held to have retained sufficient control to subject it to liability for its own negligence in ordered the work to resume.[100]

The CoE assumed responsibility for the safety of all employees at the construction site when it retained control over the safety plan.   Through its negligent supervision, instruction, review, revision, and dictation during the six-month plan approval

---

[98] Exhibit 6 at ACE000017, e-mail from S. Kimbrell to G. Zahn and P. Salmon, dated March 25, 2002.
[99] *See above* at p. 12.
[100] Moloso, 644 P.2d at 210.

process, the CoE created a dangerous safety plan which resulted in serious and permanent injury to the plaintiff.

Plaintiff's expert Frank Burg, a certified safety expert with over 30 years of experience within the safety and health profession,[101] will testify that the CoE violated safety standards established by OSHA, the Associated General Contractors of America, American National Standards Institute, the National Safety Council, and their own safety program, as well as the standards, customs and practices within the construction industry, when it failed to implement, communicate, monitor and enforce an effective safety program.[102]

Mr. Burg will also testify that the CoE violated the standards, customs and practices within the construction industry when it failed to follow its own safety program and anticipate the potential danger from falls during construction at the site.[103]   Specifically, all standards, customs and practices within the construction and general industry require floor openings to be barricaded with a standard guardrail and/or covered with secured covers.[104]   In addition, Mr. Burg will testify that it is well accepted within the safety and health profession that elimination of the floor opening hazard with a secure cover, rather than reliance on guardrails or

---

[101] See Curriculum Vitae of Frank Burg, attached hereto as Exhibit 20.
[102] Preliminary Report of Frank Burg, dated October 23, 2006, attached hereto Exhibit 19, p. 2, paragraph 1.
[103] Id. at paragraph 2.
[104] Id.

personal protective equipment, was the first choice for safety engineering at the site.[105]

Finally, Mr. Burg will testify that the CoE's failure to take reasonable and necessary precautions and to follow the well-established safety hierarchy to implement engineered controls for the safety of workers at the site was the cause of plaintiff's injury.[106]

E.    HAVING ESTABLISHED RETAINED CONTROL, NEGLIGENCE PER SE VIA VIOLATIONS OF OSHA AND ALASKA'S SAFE PLACE TO WORK ACT ARE ALSO PROVEN

Having established that the CoE negligently exercised its retained control under a common law 'reasonable person' standard of care, plaintiff also has established that the CoE's actions amount to negligence per se:

> "When violation of a statutory or regulatory provision constitutes negligence per se, that provision supersedes the common law definitions of both duty and standard of care.  In order for a provision to be basis of negligence per se instruction, it must set forth a specific standard of conduct beyond that defined in a common law duty.  A test for specificity was established in Bachner v. Risch, 554 P. 2d 430, 442 (Alaska 1976): "[i]f a positive and definite standard of care has been established by legislative enactment whereby a jury may determine

---

[105] Id. at p. 3, paragraph 5; see also id. at paragraph 7:  "...Human Factors experts have recognized the tendency for humans to believe/assume that their passage through buildings and structure will be safe and that responsible parties have taken appropriate action for their protection.  Workers do not expect that holes will be unprotected and are accustomed to expect such hole will be protected by barricade and /or covers.  Safety professionals understand that individuals such as Mr. Wallender will assume they would be protected by such measures.  It is for this reason that the NFPA Life Safety Code, BOCA, OSHA, Corp of Engineers and many other safety standards require floor openings to be barricaded, and/or securely covered."
[106]  Id. at p. 7 ("Summary").

whether there has been a violation thereof by finding a single issue of fact, a violation is negligence per se...."[107]

### i.    OSHA Violations

The CoE admits that the fall protection provisions of the site's safety plan violate OSHA regulations which state that "every stairway floor opening shall be guarded by a standard railing," and that "every hatchway and chute floor opening shall be guarded" by a hinged floor opening cover or removable railing."[108]  "[OSHA] does not allow the option of using a personal fall arrest in place of a physical barrier, but [the safety plan] allowed the option."[109]  OSHA's requirement that all floor openings be guarded by a railing or cover establishes a positive and definite standard of care.  The regulation is unquestionably specific beyond the standard of care articulated at common law in that it provides detailed requirements for when a guardrail or cover is required, and was promulgated to protect workers like the plaintiff from injuries like the one he suffered, specifically, a fall through a floor opening.  As the CoE admits that the safety plan violated OSHA regulations, the jury does not need to determine whether there has been a violation.  Negligence per se has been established.

---

[107] *Dahle v. Atlantic Richfield Company*, 725 P. 2d at 1073 (citations omitted).

[108] 29 CFR § 1910.23; Government's Brief at 8-9; *see also* Exhibit 19 (plaintiff's expert affidavit and report).  Alaska has adopted 29 CFR § 1910.23 as an occupational safety and health standard in this state.  *See* AS 18.60.030.  Thus, violation of the federal regulations is also a violation of the state regulations.

[109] Government's Brief at 9.

ii.    Violation of the Alaska Safe Place to Work Act

Alaska has adopted OSHA's fall protection provisions as an occupational safety and health standard for all employers in this state.[110]  The Alaska Safe Place to Work Act, in addition to requiring that all employer's comply "with all occupational safety and health standards and regulations adopted by the department," requires all employers to furnish and prescribe "the use of suitable protective equipment, safety devices, and safeguards as are prescribed for the work and work place;" "control or technological procedures, and monitoring and measuring employee exposure in connection with hazards, as may be necessary for the protection of employees;" and to furnish "each employee employment and a place of employment that are free from recognized hazards that, in the opinion of the commissioner, are causing or are likely to cause death or serious physical harm to the employees."[111]

Having previously established retained control, the facts as described above also show that the CoE owed a duty to plaintiff under the Alaska Safe Place to Work Act to comply with the state's safety regulations and to provide a safe place to work, "free of recognized hazards that … are likely to cause death or serious physical harm…."  The CoE's violation of the OSHA fall protection provisions as adopted by the State of Alaska amounts to negligence per se and leads directly to a per se violation of the Alaska Safe Place to Work Act as well.

---

[110] *See* AS 18.60.030
[111] AS 18.60.075 (2)-(4).

## IV. CONCLUSION

The government has failed to meet its burden of proof. The extent to which a party retained sufficient control is "normally a question of fact left to the jury."[112] Under the facts asserted in plaintiff's complaint a reasonable person could find that the CoE assumed or retained control sufficient to create liability for the negligent exercise of that control under Alaska tort law. Accordingly, this court should deny the government's motion to dismiss.

RESPECTFULLY SUBMITTED this 30TH day October, 2006.


/s/ _____
PETER R. EHRHARDT
Alaska Bar No. 8006016
Attorney for Plaintiff




CERTIFICATE OF SERVICE:

I, the undersigned, hereby certify that on this 31ST day of October, 2006, I caused to be served by EMAIL a true and correct copy of the foregoing & all attachments & exhibits.

/s/ _____
NATHAN BIRCHFIELD

---

[112] *Petranovich*, 22 P.3d at 454.