# CONVERSATION RECORD

**TO:** FILE:

**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]

**CONVERSATION WITH:** JOHN BEIER, FAIRBANKS RESIDENT OFFICE, SAFETY OFFICE

**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 10 OCTOBER 2002
**TIME:**
**PARTIES:**

---

I explained that I had been appointed as the Investigating Official for the accident that occurred on the 5th of August on the Family Housing project and would like to ask him a few questions.

I asked him if he had a contact number for the injured man, Joel Wallender. He said he did not.

I asked him if he had a final medical report of the victims' injuries. He said no.

I asked him about the "fall prevention" training record which the injured man had signed. The injured man had signed it but the person conducting the training had not. I asked if he knew who performed the training. He said it would have been one of three people, who were all qualified, but he did not know which one provided the training.

I asked him if he was familiar with the personnel anchoring system used at the job site. He said he was, and that a Miller anchoring system was used. I followed up by stating that in the Board of Investigation report they had a picture of the anchor and a snap hook and that the two were incompatible, the snap hook would not fit in the anchor. I asked him if he knew why the snap hook would not fit in the anchor. He then explained how the system worked. The system is meant to have a locking D-ring carabineer that attaches to the anchor and then the snap hook attaches to the D-ring, and that the snap hook will not fit on the anchor itself. I asked him if there was a D-ring at the scene. He said no, a D-ring was not found at the scene. He went on to explain how the personal harness system worked. Basically, the system consists of an anchor, a locking D-ring that attaches to the anchor, a snap hook that attaches to the D-ring, and a lanyard with a shock absorbing device that is connected to the snap hook. The shock absorbing device is packaged so it is out of the way of the worker and is deployed when a force is exerted upon it. A manufacturers tag is displayed when deployed so that it cannot be reused once deployed. He went on to say that the shock absorbing device had not deployed, it was still packaged and the tag was not displayed.

I asked him if the missing D-ring had been located. He replied that the D-ring had not been found at the scene of the accident or on the injured man, but, one had been found on the other side of the building hooked up to a self retracting life line or "yo yo". The assumption was made that this D-ring belonged to the injured man as there were three systems hooked up, three men were supposed to be working at the location, and he was one of the three.

Mr. Beier went on to say that the accident was really bad in the sense that just the week prior to the accident, OSHA had made an impromptu inspection of the construction site and all the workers were tied off and they were only working on the first floor.

## CONVERSATION RECORD

**TO:** FILE:

**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]

**CONVERSATION WITH:** JEFF CRAWFORD, OSBORNE CONSTRUCTION, (907) 356-1160

**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 10 OCTOBER 2002
**TIME:**
**PARTIES:**

I explained that I had been appointed as the Investigating Official for the accident that occurred on the 5th of August on the Family Housing project and would like to ask him a few questions.

I asked him if he had a contact number for the injured man, Joel Wallender. He said he did not, but that he would get one for me from the home office. He later called back to tell me that Joel was in Denver, Colorado, at the Craig Hospital and could be reached at (303) 789-8760.

I asked him if they used Miller anchors on the job site. He replied that they used the complete Miller anchoring system, complete with anchor, locking D-ring, lanyard, etc. He confirmed the information that John Beier had related to me. He then said that it had been assumed that the injured man had not been hooked up to the anchor and may have been trying to pull up the anchor.

I asked him if he had spoken to the injured man since the accident. He said no.

I asked him what he knew about the locking D-ring that was found hooked up to the retracting system on the other side of the building. The information he gave confirmed that relayed to me by John Beier. He also said that the other two workers that had been hooked up to that system knew that the injured worker had been hooked up to the system also.

I asked him who had conducted the "fall prevention" training as that person had not signed the training form. He said that Matt Emerson had conducted the training.

I asked if construction had progressed to the point where the conditions at the time of the accident could not longer be seen. He said that was correct.

3

## CONVERSATION RECORD

**TO:** FILE:
**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]
**CONVERSATION WITH:** JOEL WALLENDER, CARPENTER, OSBORNE CONSTRUCTION, INJURED MAN,
**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 15 OCTOBER 2002
**TIME:**
**PARTIES:**

I explained that I had been appointed as the Investigating Official for the accident that occurred on the 5th of August on the Family Housing project and would like to ask him a few questions if he was up to it.

I asked him if he could remember the accident and relate to me in his own words what had happened. He said he could not remember too much about the accident, falling and getting hurt. He remembered being told by the supervisor to go over and remove some of the Miller clips (anchors). He was doing that and the next thing he remembered was waking up in the hospital. He said it was odd, that generally the anchors were placed about 6 feet from an edge but these were right on the edge and he didn't know why. He also said that they had been using barricades around holes but that when they were in the way, like when they would be putting up a wall, they would be removed, but that was not the case here. He didn't know why there were no barricades.

I told him about a D-ring being found on the other side of the building and that it was speculated that this was his D-ring and asked if he remembered being hooked up to it earlier that day. He said no, he didn't remember that.

I asked him about the extent of his injuries. He said he didn't know technically what was wrong but that he had no movement or feeling in his legs, he had some memory loss, and he had been told that he had a level T-12 spinal chord injury. He said I could contact his doctor, Mr. Weintraub.

## CONVERSATION RECORD

**TO:**        FILE:

**FROM:**   BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]

**CONVERSATION WITH:** ADMITING NURSE, CRAIG HOSPITAL, (303)789-8000

**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:**        16 OCTOBER 2002
**TIME:**
**PARTIES:**

I explained that I had been appointed as the Investigating Official for the accident that occurred on the 5th of August on the Family Housing project and would like to speak to Dr. Weintraub about Joel Wallender and the extent of his injuries. I was told that they could not release any of this type of information without written authorization from the patient.

## CONVERSATION RECORD

**TO:** FILE:

**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]

**CONVERSATION WITH:** JEFF CRAWFORD, OSBORNE CONSTRUCTION

**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 16 OCTOBER 2002
**TIME:**
**PARTIES:**

I called Jeff back with two follow up questions.

First I asked him if there was a contact for their home office who could talk to me about the extent of Joel's injuries as his doctor could not discuss this with me. He gave me the name of Rokel Williams (sp) at (425) 827-4221.

I next asked him about the use of barricades. I stated that the Corps safety manual required the use of barricades or coverings for opening such as the one at the accident site, but that their fall protection plan required barricades or personnel to use a personal fall protection system such as the safety harness and shock absorbing lanyard, and that Joel had indicated that sometimes barricades were used and sometimes they weren't. I asked him to explain this. He stated that they did use barricades. As the work progressed, the carpenters would install the barricades before the work of putting up the walls began. In this instance, the floor was complete but installation of the walls had not started in the area of the opening but had at the other end of the floor, so there were barricades but they had not been put up in that location. If personnel were to be on the floor they were to use their personal fall protection device. However, now they used barricades regardless.

I asked him if their safety plan had been submitted for review and approval. He said it had been submitted but that their QC officer would know about the actual submittal status.

Page 1 of 1, 10/22/02

6

## CONVERSATION RECORD

**TO:** FILE:
**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]
**CONVERSATION WITH:** JEFF CRAWFORD, OSBORNE CONSTRUCTION
**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 22 OCTOBER 2002
**TIME:**
**PARTIES:**

Jeff returned my call from earlier.

I asked him if he had any comments to my previous fax concerning the conversation logs between us. He had two minor corrections to the 16 October conversation log which were incorporated into the document as we spoke.

I then asked if there were additional anchors that could have been used while the anchors around the opening were being removed. He was unsure, but believed there would have been. However; he stated the plan for working in that area was; as walls were being put up they would install barricades and then remove the anchors. The anchors around the opening would have been used while they were installing the anchors. He also stated it was unclear why the injured man was in that area as they were not scheduled to be working in that location at that time.

I then asked if he knew why the anchors were placed so close to the opening to begin with. He stated he did not recollect why.

I repeated my notes to Jeff to insure I accurately reflected what he had said.

## CONVERSATION RECORD

**TO:** FILE:

**FROM:** BRIAN WEST, CEPOA-EN-EE-B [907-753-5613]

**CONVERSATION WITH:** PHIL SALMON, COE FAIRBANKS RESIDENT OFFICE (907) 353-7968

**SUBJECT:** 5 AUG 2002 ACCIDENT, FAMILY HOUSING PROJECT, FT. WAINWRIGHT

**DATE:** 21 OCTOBER 2002, FOLLOW UP ON 22 OCTOBER 2002
**TIME:**
**PARTIES:**

I called Phil and explained that I had been appointed as the Investigating Officer for the accident that occurred on 5 August on the Family Housing Project and would like to ask him some questions.

I asked him if he was familiar with the safety plan submitted by Osborne Construction. He was.

I asked him who had accepted the original safety plan. Phil explained that the original plan had been rejected and given an E code. A subsequent plan, submitted just before the pre-constructin conference was given a G code, accepted with comment. He provided me with an email that showed this. The Contractor was to have addressed the comments within 21 days. Either just after or just before giving this acceptance a pre-construction conference, and mutual understanding meetings for safety and quality control were held. During these meetings, it was noted that their plan would be accepted with comment and that resubmission would be required. Considering this, there were considerable discussions about the accommodations Osborne Construction would be expected to make to insure safety on the job until such time as their plan could be resubmitted. Osborne Construction made commitments to resubmit the plan in a timely manner and to address all comments. It was perceived that Osborne had a very proactive safety program and were very committed to safety. They had a strong, experienced management and QC team in place and they were going to exercise increased scrutiny of safety and increased management support/presence in day to day operations. Their commitment to safety appeared strong. The safety plan was then resubmitted within 21 days but routing within the Resident Office went awry and did not get to the right people in a timely manner. The resubmitted safety plan was accepted with comment on 20 August 2002. Final acceptance was given on 6 September 2002.

Phil provided the comments given to Osborne Construction in the email identified above. Phil noted that there were no comments on the fall protection plan. I asked him why there were no comments on the fall plan. Phil stated that the plan seemed like a good plan and that it was quite comprehensive.

Page 1 of 2, 10/23/02

I stated that in EM 385-1-1 there was a requirement that openings through which a man could fall, were required to be barricaded or covered, and that the fall plan submitted by Osborne required barricades or personnel to use a fall arrest system and asked why the review would not have seen this. Phil stated that this was not noticed. This level of detail would not typically looked for or noticed, and expecting the Contractor to include this level of detail would require the Contractor to basically submit EM 385-1-1 in toto for review. He went on to say that a number of experienced people including himself had reviewed the plan and thought, that while it needed some corrections and augmentation, it was adequate to allow them to commence work provided they committed to timely correction and resubmission, and that their management and QC team were committed, experienced and willing to make accommodations, and take extra efforts to make the plan work. The NAAO QA staff monitored and participated in the contractors safety and QC efforts and they were professional, conscientious and diligent.

Phil went on to say that about a week before the accident, the state OSHA had made a visit to the site with the Industrial Hygienist from the NAAO and that there were several minor corrections that needed to be made but that there were no comments/observations noted on fall protection. Also, although he has not seen it, it is his understanding that the determination from the state OSHA investigation into the accident was that the employee acted on his own. He was attempting to confirm this.