NELSON P. COHEN
United States Attorney

SUSAN J. LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
Susan.Lindquist@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOEL WALLENDER, | ) Case No. 3:05-cv-263-JKS |
| | ) |
| Plaintiff, | ) |
| | ) **UNITED STATES' REPLY TO** |
| vs. | ) **PLAINTIFF'S RESPONSE IN** |
| | ) **OPPOSITION** |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

   Wallender does not claim that there are facts in dispute. Wallender claims

that he is not suing the government for the breach of a contract claim. Dkt 17 at

25. Wallender's tort claim is based on duties that arise because of retained control

by the employer of an independent contractor under Restatement (Second) of Torts

§ 414, as the applicable law adopted by Alaska. The government agrees that retained control is the only feasible means to create a tort duty for the CoE, and it cited to the same section in its Motion.[1] Dkt 10 at 17-18. Section 414 address the limited situation when an employer of an independent contractor so actively participates in the work assigned that it can be found to have retained control. "Under the FTCA, the United States is subject to liability for the negligence of an independent contractor only if it can be shown that the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities." *Laurence v. Department of the Navy,* 59 F.3d 112, 113 (9th Cir.1995) (citing *United States v. Orleans,* 425 U.S. 807, 814-15 (1976)).

Recently the Alaska Supreme Court analyzed the type of control needed to trigger a duty under Restatement (Second) of Torts § 414. *Anderson v. PPCT Management Systems, Inc.*, 145 P.3d 503, 510 (Alaska 2006). The court wrote:

> The employer has not retained sufficient control where he has only 'a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or

---

[1] One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

recommendations which need not necessarily be followed, or to prescribe alterations and deviations.' Instead, the employer must retain such control 'that the contractor is not entirely free to do the work in his own way.' Because retained control subjects an employer to direct liability, the control retained must be related to the cause of the injury.

Wallender alleges two sources of alleged retained control – the contract terms and CoE employees' actions. Dkt 17 at B.

## I.  NEITHER THE CONTRACT TERMS NOR THE SAFETY PLAN APPROVAL CREATED RETAINED CONTROL

1.   Contract terms:

   A.   The FAR's

Almost all CoE contracts for construction contain identical clauses which are Federal Acquisition Regulations ("FAR's"). "The Federal Acquisition Regulations (*see* Title 48, Chapter 1, of the Code of Federal Regulations) require that certain standard clauses be incorporated into all fixed price construction contracts where the contract price exceeds small purchase limitations. . . .  Among such clauses is the accident prevention clause. . . ." Routh v. United States 941 F.2d 853, 854 (9th Cir. 1991).  The FAR's retained the same number in all contracts.  So, for example, FAR "52.236-13 ACCIDENT PREVENTION (Nov 1991)" which was included in the Osborne Contract (Dkt. 17, Ex. B at 93) is the same FAR 52.236-13 which was discussed in *Routh.  Cf.* Dkt 17, Ex. B at 93 *with*

941 F.2d at 854.  The same clause was in the contract in *Moody v. U.S.*, 753 F.Supp.1042, 1052 (N.D.N.Y. 1990)[2] and *Clark v. United States,* 805 F.Supp. 84, 86 (N.H. 1992).

In *Lipka v. United States,* 369 F.2d 288, 291 (2d Cir.1966), *cert. denied,* 387 U.S. 935 (1967) Lipka, the court considered the same FAR clause and wrote:

> The courts which have considered the accident prevention program of the Corps of Engineers have held that it does not transform contractors with the Corps into employees of the United States.  *Grogan v. United States*, 341 F.2d 39 (6 Cir. 1965); *Kirk v. United States*, 270 F.2d 110, 117-118 (9 Cir. 1959); cf. *United States v. Page*, 350 F.2d 28 (10 Cir. 1965), cert. denied, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); *Buchanan v. United States*, 305 F.2d 738 (8 Cir. 1962); *Richardson v. United States*, 251 F.Supp. 107 (W.D.Tenn.1966).

369 F.2d at 291.

Wallender also highlights the contract clause, "Inspection of Construction," which states that "[a]ll work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract."  Dkt 17 at 11 But there is no evidence that the CoE inspected the section of the job site where Wallender fell or that the hole in the

---

[2] The language is slightly different as this case was published in 1990, before the Accident Prevention Clause was amended in 1991).

floor had even bee cut before Mr. Zahn went on vacation.

The same clause was in a contract analyzed in *Moody v. United States,* 753 F. Supp. 1042, 1044 (N.D.N.Y. 1990). The contract also contained the accident prevention clause. The court found that "the VA delegated many responsibilities and obligations with respect to performance and safety. The VA, however, retained certain rights to ensure that Bhandari-Davis [its contractor] complied with contractual specifications and maintained a safe work environment." Id. at 1046. The court found that "the government's contractual reservation of such rights does not constitute the degree of control over Bhandari-Davis' day-to-day operations such that the government may be held liable for the negligence of Bhandari-Davis' employees." Id. The court found that "[b]y retaining the duty to notify Bhandari-Davis of noncompliance with the contract's safety requirements, to order Bhandari-Davis to undertake the required corrective action, and to stop work if satisfactory corrective action was not taken, the government retained nothing more than an oversight role with regard to the safety of employees of Bhandari-Davis. When the government merely acts as an overseer, and neither manages the details of the contractor's work nor supervises its daily performance, the government has not exercised the degree of control necessary to hold the government liable for the negligent acts or omissions of the contractor's employees. " Id. at 1047.

B.   The Safety Plan and Approval Process

Wallender also argues that because the CoE approved the safety plan, it retained control. Dkt 17 at 31.  In *Berghoff v. United States*, 737 F. Supp. 199, 202 (N.D. N.Y. 1989), the contract also directed the contractor "to submit a safety plan and health plan for the Contracting Officer's approval, and to take any other safety and health measures that the Contracting Officer deems necessary."  The court concluded that:

> These safety provisions, however, do not provide for such day-to-day supervision by the government as would convert Kokolakis from an independent contractor into a federal agent.  The safety provisions in the contract mainly set forth minimum standards for safety, and reserve the government's right to inspect the site and find Kokolakis deficient.  In *Orleans,* the Court explained that in a contract, "the Government may fix specific and precise conditions to implement federal objectives.  Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs . . . into federal governmental acts." *Orleans,* 425 U.S. at 816, 96 S.Ct. at 1977.  In *Lipka v. United States,* 369 F.2d 288 (2d Cir.1966), *cert. denied,* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967), *reh'g denied,* 388 U.S. 925, 87 S.Ct. 2129, 18 L.Ed.2d 1381 (1967), the Court of Appeals found that even when a contract between a construction company and the Army Corps of Engineers bound the contractor to follow the Corps' safety manual and additional safety measures, empowered the Contracting Officer to order compliance with these measures, and provided for an employee of the Corps to be at the site, the construction company nonetheless was an independent contractor under the FTCA.  *Lipka,* 369 F.2d at 291.

Wallender argues the CoE "assumed" duties because it "affirmatively

assumed a 'special item' contractual duty to review and approve the site-specific safety plan" and "the CoE dictated the specific safety methods to be used at the site. Dkt 17 at 31. Just like the FAR's, the clause requiring a contractor to submit its safety plan for approval is in all contracts. EM 35-1-1 01.A.06 states: "Before initiation of work at the job site, an accident prevention plan - written by the prime contractor for the specific work and hazards of the contract and implementing in detail the pertinent requirements of this manual - will be reviewed and found acceptable by designated Government personnel." Dkt 17, Ex 3 at 4. The duty of the CoE to review and approve the Plan is in the EM 385 -1-1. Just sentences above, the EM 35-1-1 01.A.02 states: "The employer shall be responsible for initiating and maintaining a safety and health program that complies with the US Army Corps of Engineers (USACE) safety and health requirements." Thus, just because the CoE approves a safety plan and it misses something, it is still the employer who is responsible. Clause .06 does nothing to negate clause .02.

Wallender alleged in his Complaint at ¶ 11 - that "Mr. Phil Salmon . . . failed to insure that the safety plans submitted by Osborne Construction met the requirements of EM 385-1-1." In his response in opposition, Wallender claims that the government assumed an affirmative duty to approve the safety plan and

negligently allowed work to proceed before the Plan was approved. Dkt. 17 at 10. Wallender also argues that the contract clause requiring approval is a "special item," and not boilerplate. Dkt 17 at 7. Wallender argues that no explanation is given as to why work was allowed to proceed without an approved safety plan. Dkt 17 at 10.

First, approving the Plan is an EM clause and not a special item unique to the Osborne contract. Second, starting work without an approved plan is not related to Wallender's accident. If that fact created a tort duty, then the CoE would have retained control over all of Osborne's activities and be responsible for all accidents on the basis of a lack of a formal approval. That is simply not a tenable theory.

There is simply no tort duty to approve a safety plan, and therefore, even assuming Mr. Salmon breached a duty to correctly approve the safety plan, this does not result in a tort. This is not the type of "retained control" that creates tort liability, where there was none.

Wallender never addressed the undisputed fact that *Other* parts of the contract, different from the Safety Plan, were equally binding on Osborne and they required it to follow EM 385-1-1 (Dkt 17, Ex. 3 at 2, 338), which required holes to be covered (Dkt 17 at Ex. 3 at 248) as well as 29 CFR § 1910.23, which also

required holes to be covered.  Dkt 10 at 5; *See* contract Dkt 10 at Ex. 2 at 93 52.236-13(b)(2) & (c).  Nor was Osborne oblivious of these other contractual requirements as it included under the heading "Fall Protection Plan," number 4. which stated "Covers for openings and holes in floors . . . shall meet the following requirements. . . ."  The clause then went on to discuss such details of the cover as hinges and toe boards.  Dkt 10, Ex. C at 96.  Osborne acknowledged that covers would be used.  Thus it is disingenuous of Wallender to argue that the CoE "created an untenable and unsafe plan which violated state and federal OSHA regulations . . .," when the Contract independently required Osborne to follow OSHA, which is contained in 29 C.F.R. Parts 1926 & 1910 and required the employer to cover holes.

When it comes to safety, the contractor is never free to do the work in its own way because the Secretary of Labor mandates safety precautions that must be taken in OSHA.  All contractors must follow OSHA, but that does not mean that OSHA, which mandates that floor openings be covered retains control over all job sites, retains control of the job site or the detailed job performances.  Under *Anderson*, "the employer must retain such control 'that the contractor is not entirely free to do the work in his own way.'"  Certainly the OSHA regulations do not amount to control which result in the contractor not being able to do the job its

way. Similarly, the CoE's mandates to follow EM 385 -1-1, OSHA *and* the safety plan does not amount to retained control.

The retained control which is sufficient to create tort liability must be "the control retained must be related to the cause of the injury." The Plan did not push Wallender into the opening, nor did the Plan have anything to do with what Wallender was doing, because Wallender failed to refer to the Plan at all. He did not even use the other safety method in the Plan, which was to tie off. Protection was to be obtained by "the use of a guardrail system, cover or personal fall arrest system." Id.; Dkt 10 at 11-12. It really did not matter what was in the Plan because Wallender did not follow anything. People cause accidents, not paper. Wallender chose how he was to remove the anchors. Wallender chose not to use any of the fall protection. Dkt 10, Ex. B at 96. Wallender is simply wrong when he argues that the CoE approved "the very fall protection methods which led to Wallender's injuries. Dkt 17 at 31. Wallender simply did not use any of the approved methods.

## II. MR. ZAHN'S AND MR. SALMON'S ACTIONS DID NOT AMOUNT TO RETAINED CONTROL.

Once the project began, Wallender alleges that the CoE retained control by implementing the contract terms by its actions. Mr. Zahn consulted with Osborne management on a daily basis, except when he was on leave, and he occasionally

inspected the project. Wallender argues that Mr. Zahn's presence on a daily basis and affirmative actions at the site is compelling evidence of his exercise of control at the site. Dkt 17 at 31, 33. Wallender associated presence with control, even though some of the time Mr. Zahn was on site for a mere 15 minutes. Wallender does not explain what Mr. Zahn did to control the day to day operations. Certainly, Mr. Zahn did not control any day to day activity during the week of the accident because he was on leave starting August 1, which was five days before the accident. Ex. I at 1. Moreover, he was assigned to monitor another project that required his time. In addition he retained his regular administrative duties. Id.

Wallender claims the actual inspections demonstrate retained control. Certainly the fact that the CoE inspector was gone for four days without a replacement demonstrates that the CoE was not exercising day to day supervision over how Osborne did its job. Since the motion, the CoE has discovered and produced the Daily Reports generated by Osborne for the days Mr. Zahn was absent.[3] The reports are for August 1, 2, 3 (4 is Sunday and therefore does not exist) and 5, the day Wallender fell. Exs. J, K, L & M. The first two pages of each day list the buildings that Osborne employees worked on and what they did.

---

[3] Government Counsel will file a Motion for leave of court to file the new exhibits J, K, L, and M. The reports were provided to Plaintiff on January 8, 2007. Certainly, the CoE would not oppose a rebuttal of any argument referring to the daily reports.

Of particular importance is a note under **Safety** in the August 1, 2002 report. It states "Safety violations for lack of fall protection (observed yesterday by QC) were issued to two carpenters." Ex. J at 3535. For the next two days, no safety violations were observed. Ex. K at 3513, Ex. L at 3507. On August 5, 2002, the safety reporter describes Wallender's fall at Building 1410. Ex. M at 3494. The reports indicate that Osborne took charge of observing safety and enforcing it. There was no CoE day-to-day control of safety.

On August 1, 2002, when Mr. Zahn was not even at the site, at Building 1410, Osborne was just "setting the first floor wall panels and started 2nd floor beams and joists." The joists, which are the timbers which hold up the planks of a floor, were just getting started.[4] Th second floor, from which Wallender fell, had not progressed much before Mr. Zahn left.

Reviewing the daily reports, it is also clear that Osborne was running the show. The reports show that Osborne employees were working on ten buildings. Ex. J at 3534. That day, Osborne employees worked 761 hours, with the top four managers working 10-14 hour days. Id. at 3536. Mr. Zahn did not work that day. Osborne employees interacted with an OSHA inspector about OSHA site inspection issues. Id. at 3538. Osborne had a subcontractor working on road

---

[4] *See* Dictionary.com for definition of joist.

crossings that day. Id. at 3540. It is not even a close call to conclude that Osborne was in charge of safety and in charge of the project. It cannot be said that Osborne was "not entirely free to do the work in his own way." *See Anderson,* 145 P.3d at 510.

## CONCLUSION

The CoE's listing of FAR's in the contract did not create retained control. Boilerplate contract terms do not create control.

The CoE's monitoring of its project to make sure it got value for its $22 million investment did not create retained control.

For four days preceding the accident the CoE had no employee on site and it did not direct safety or construction.

The government asks the court to dismiss this case because the CoE had no duty based on retained control and Osborne was an independent contractor.

RESPECTFULLY SUBMITTED January 19, 2007,

                                                             NELSON P. COHEN
                                                             United States Attorney

                                                             s/ Susan J. Lindquist
                                                             222 West 7th Ave., #9, Rm. 253
                                                             Anchorage, AK 99513-7567
                                                             Phone: (907) 271-3378
                                                             Fax: (907) 271-2344
                                                             E-mail: susan.lindquist@usdoj.gov
                                                             AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2007,
a copy of the foregoing **UNITED STATES' REPLY
TO PLAINTIFF'S RESPONSE IN OPPOSITION** was served
electronically on Peter R. Ehrhardt.

s/ Susan J. Lindquist