LAW OFFICE OF PETER R. EHRHARDT
215 Fidalgo Ave., Ste. 203
Kenai, AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
E-mail: ehrhardt@law.kenai.com
AK Bar Number: 8006016

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOEL WALLENDER,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No.: 3:05-cv-263-JKS<br><br>PLAINTIFF'S SUR-REPLY TO UNITED STATES' REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS ALL CLAIMS |

With the Court's permission pursuant to an Order from Chambers dated January 30, 2007, Plaintiff, Joel Wallender, through counsel, sur-replies to the United States' Reply to Plaintiff's Response in Opposition to Motion to Dismiss All Claims pursuant to Fed.R.Civ.P. 12(b) (1) and 129b) (6) (hereinafter "Government's Reply").

ARGUMENT

The government claims that the parties agree that "retained control is the only feasible means to create a tort duty" and that plaintiff "does not claim that there are facts in dispute."[1] Both of the government's assertions are mistaken.

---
[1] Government's Reply Brief at 1-2.

I.  **Alaska Tort Law Holds the Government Liable Under Both the Retention of Control and the Assumption of Duty Theories of Liability for Its Negligent Exercise of Assumed Affirmative Duties with Respect to Safety**

The government concedes that the employer of an independent contractor owes a duty to the independent contractor's employees to avoid endangering them <u>*by its own*</u> *negligence or affirmative act*.[2]  Alaska tort law holds that "a defendant who 'retains the right to direct the manner of the independent contractor's performance, <u>or assumes affirmative duties with respect to safety</u>,' has retained sufficient control to be held liable if he negligently exercises that control."[3]  Plaintiff's Opposition describes in detail the CoE's negligence in contributing to and approving the incorporation of faulty fall protection provisions from the CoE's safety manual (the "EMS") into the safety plan which was in place at the construction site at the time of plaintiff's injury.[4]  The government does not dispute any of plaintiff's factual allegations regarding the creation of the flawed plan, the approval process or the CoE's actions leading up to and beyond plaintiff's accident.

---

[2] United States Motion to Dismiss All Claims ("Government's Opening Brief") at 18 citing Rest. 2nd of Torts § 414 (1965) and *Moloso v. State*, 644 P.2d 205, 215 (Alaska 1982); s*ee also* Plaintiff's Opposition at 26-27 *citing Moloso,* 644 P.2d at 211, n.5 ("Section 414 is sometimes referred to as an "exception" to the general rule that the employer of an independent contractor is not liable for injuries sustained by the employees of that independent contractor.  Calling it an "exception, however, appears to be nothing more than a circuitous route around the simple rule that *anyone, including an employer of an independent contractor, may be held liable for his or her own negligence.*" (emphasis added)

[3] *Parker Drilling Co. v. O'Neill*, 674 P.2d at 776 (Alaska 1983) *citing Moloso v. State*, 644 P.2d 205, 211 (Alaska 1982), *et al*; *see also Anderson v. PPCT Management Systems, Inc.*, 145 P.3d 503, 510 footnotes 26 and 27; Plaintiff's Opposition at 25 -26.  With regard to the analytical similarity between the retention of control theory and the assumption of duty theory *see Moloso* at 212 *citing Hammond v. Bechtel,* 606 P.2d 1269, 1277 n. 14 & 15 (Alaska 1980)("'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully….' The concept of voluntary assumption of a duty has long been recognized in Alaska…."

[4] Plaintiff's Opposition at 2-20.

The government does not dispute that the CoE's review and approval of the safety plan was *a mandatory contractual duty*, not a discretionary or gratuitous right which may be exercised or not at the CoE's whim.[5] The government does not dispute that the duty to notify the independent contractor of <u>noncompliance</u> in regard to safety and other violations is also a *mandatory contractual duty*.[6] The government does not dispute that through these provisions the CoE assumed certain duties in regard to safety at the site.[7]

It is also undisputed that the CoE was aware the independent contractor was using "canned documents" to create the safety plan,[8] that during the six-month approval process the CoE had misgivings about the contractor's ability to create a safe plan,[9] and that the EMS fall protection provisions ("Section 21") used by the contractor as a model (as required by the contract) are confusing, misleading and incomplete.[10]

The government concedes that the fall protection plan the CoE approved for the site includes provisions which violate OSHA as well as safety standards, customs and practices within the industry[11] and that the faulty fall protection provisions in the

---

[5] Plaintiff's Opposition, Exhibit 2 at 21 (Section 01015 p. 3 ("Special Items") at Part 1.4 "Accident Prevention Plan"): "**The Contractor <u>shall</u> obtain the [CoE's] approval** of the Accident Prevention Plan required by the Safety and Health Requirements Clauses prior to the start of any work at the project site." (Emphasis added).

[6] Id. at Exhibit 2 at page 2 [Section 52.236-13 (d)]: "Whenever the [CoE] becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Governmental personnel, **the [CoE] <u>shall</u> notify the Contractor**…." (Emphasis added).

[7] *See generally* Government's Reply at 7-8.

[8] *See* Plaintiff's Opposition at p. 5.

[9] Id. at footnote 13 ("does not bode well for this project.")

[10] *See* Plaintiff's Opposition at 17-19 and Exhibit 17 attached thereto at p. 2.

[11] Government's Opening Brief at 8-9; Exhibit 17 to Plaintiff's Opposition ("Safety Lessons Learned") at p. 2; *see also* Plaintiff's Opposition at 16-18.

approved fall protection plan mirror the CoE's own faulty EMS fall protection provisions.[12]

The government does not dispute that (a) despite contractually requiring the contractor's compliance with the EMS, the CoE failed to notify the contractor of the faulty fall protection provisions in the EMS before, during and after the approval process was complete; (b) despite actual or constructive notice of the resultant safety violations contained in the fall protection plan for the site, the CoE failed to notify the contractor of "<u>noncompliance</u>" with applicable safety standards and regulations as required by the contract;[13] and (c) the CoE failed to warn employees at the site that the approved fall protection provisions (which were given to the contractor's employees for their education and instruction)[14] violated OSHA and safety standards, customs and practices within the industry.

In regard to the CoE's actions, the government simplistically states that it 'missed something' and 'missing something' should not subject it to liability because "there simply is no tort duty to approve a safety plan."[15] Obviously, however, the well-recognized tort duty owed to plaintiff in this case is *to not endanger the contractor's employees by negligent exercise of assumed duties with respect to safety*. The government conceded this point in its opening brief.[16] The CoE assumed

---

[12] Exhibit 17 to Plaintiff's Opposition ("Safety Lessons Learned") at 2; *see also* Plaintiff's Opposition at 17-19.
[13] *See* Plaintiff's Opposition at 6-7.
[14] *See* Government's Opening Brief at 9-10 alleging that plaintiff "received fall protection orientation including the material covered in the Fall Protection Work Plan" and "agreed to abide by" the faulty fall protection plan.
[15] Government's Reply at 7. Significantly, the government does not attempt to dispute its negligence in 'missing' the safety violations contained in the plan and failing to notify the contractor of noncompliance.
[16] *See* page 2, footnote 2 *supra*.

duties to review and approve a safety plan and to notify the contractor of noncompliance. The negligent exercise and breach of these duties *does* create a tort duty. Alaska tort law holds that "a defendant who 'retains the right to direct the manner of the independent contractor's performance, <u>*or assumes affirmative duties with respect to safety*</u>,' has retained sufficient control to be held liable if he negligently exercises that control."[17] Under Alaska tort law, the undisputed factual pattern presented above is enough to prove the CoE's liability for Wallender's injury under the FTCA which provides that the government is liable for:

> "personal injury or death caused by <u>**the negligent or wrongful act *or omission***</u> of any employee of the Government while acting within the scope of his office or employment, under circumstances where the Unites States, if a private person, would be liable to the claimant <u>**in accordance with the law of the place where the act or omission occurred**</u>."[18]

A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[19] Plaintiff has presented ample facts to support his claim. Plaintiff's complaint should not be dismissed.

### II. Second Circuit Decisions Regarding Inapplicable Aspects of the Retained Control Doctrine do not Negate the Government's Liability under Alaska Tort Law

Studiously avoiding any meaningful discussion of the CoE's actions in this case or Alaska's recognition of the assumption of duty theory of liability, the government

---

[17] *Parker Drilling Co. v. O'Neill*, 674 P.2d at 776 (Alaska 1983) *citing Moloso v. State*, 644 P.2d 205, 211 (Alaska 1982), *et al*; *see also Anderson v. PPCT Management Systems, Inc.*, 145 P.3d 503, 510 footnotes 26 and 27; Plaintiff's Opposition at 25-27.
[18] 28 USCA 1346(b) (emphasis added).
[19] *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citations omitted); s*ee* Plaintiff's Opposition at 2.

instead focuses again on the plain language of the contract, primarily relying on three cases from New York - *Lipka*, *Moody* and *Berghoff* - for the proposition that the government did not retain sufficient day-to-day control over the contractor's actions to subject it to liability for plaintiff's injury. However, as stated above, the FTCA imposes liability on the government for its acts and omissions "in accordance with the law of the place where the act or omission occurred."[20] Decisions of the 2nd Circuit and the Northern District of New York are not controlling. Even if referenced for guidance, none of these New York cases support the government's position in the context of the undisputed factual allegations recited above.

    A.    **Second Circuit Decisions Discussing Failure to Exercise a Reservation of the Right to Inspect Do Not Apply to Our Case**

The government cites *Lipka v. U.S.*, a 40-year-old decision from the Second Circuit based on New York tort and labor law, for the general observation that "the courts which have considered the accident prevention program of the Corps of Engineers have held that it does not transform contractors with the Corps into employees of the United States."[21] However, the cases cited by *Lipka* in support of this expansive generalization – *Grogan*, *Kirk*, *Page*, *et al* – do not make such broad pronouncements and are inapplicable to our case. Each of these cases addresses the narrow issue of whether the government should be liable for failing to exercise its contractual reservation of a right to inspect the work performed by an independent contractor. In each case the court found that the mere contractual reservation of a right to inspect the work of an independent contractor did not create a duty which

---

[20] *Id.*
[21] 369 F.2d 288, 291 (2nd Cir. 1966); *see also* Government's Reply at 4 (citations omitted).

would subject the government to liability for the contractor's negligence.[22] Significantly, none of these cases - including *Lipka* - addresses the implications of the exercise of the safety plan approval provision or a situation where the government *negligently exercised a mandatory contractual duty* with respect to safety.[23]

Our case is clearly distinguishable. Plaintiff's claims are not based on naked allegations of a failure to exercise a discretionary right to inspect work in order to discover a safety hazard. Plaintiff's claims are based on the CoE's *negligent exercise of assumed contractual duties* where the CoE (a) caused the hazardous situation itself through provision to the contractor of faulty EMS fall protection provisions, (b) possessed constructive or actual notice of fall protection plan safety violations during the plan approval process, (c) negligently exercised its mandatory contractual duty to review and approve the safety plan; (d) failed to notify the contractor of noncompliance as required by the contract; and (e) failed to warn the contractor's employees of the safety violation/hazards contained in the fall protection plan. Thus, *Lipka, et al*, are inapplicable to the facts of this case.

> B. The Second Circuit's "Strict Control Test" in Regard to Liability for the Contractor's Negligence Does Not Negate the CoE's Liability Under Alaska Tort Law

---

[22] *Grogan*, 341 F.2d 39, 43 (6th Cir. 1965); *Kirk*, 270 F. 2d 110, 116-117 (9th Cir. 1959); *Page*, 350 F.2d 28, 30 (10th Cir. 1965).

[23] It's not even clear that the approval provision was even a part of any of these 40 to 50-year-old contracts. Notably, the contract discussed in the 9th Circuit's 1959 decision in *Kirk* was only 16 printed pages long. *Kirk*, 270 F.2d at 113. In bold contrast, the contract at issue in this litigation is a 772 page document consisting of 382 pages of contract clauses and directives, as well as 390 pages of appendices addressing every aspect of demolition and construction at the site. *See generally* Contract No. DACA 85-01-C-0026 attached as Exhibit 1 to Plaintiff's Opposition and Plaintiff's Opposition at 3. The CoE's current construction contracts are *not* the same contracts of yesteryear discussed in the government's cases.

In *Moody*, another Second Circuit decision relied on by the government, the court held that "[w]hen the government merely acts as an overseer, and neither manages the details of the contractor's work nor supervises its daily performance, the government has not exercised the degree of control necessary to hold the government liable *for the negligent acts or omissions of the contractor's employees.*"[24] Similarly, in *Berghoff* a New York district court, citing *Lipka*, found that certain contractual safety provisions taken by themselves, including the requirement that the contractor submit a safety plan for approval, did not provide for such day-to-day supervision by the government as would make the government liable *for the contractor's negligence.*[25] While the Second Circuit might deny recovery against the government *for a contractor's negligence* <u>if</u> it is proven that the government did not exercise day-to-day supervision or direction of the contractor's actions, the government has failed to show how, if at all, the "strict control test" enunciated by the Second Circuit has been adopted in Alaska or how it affects plaintiff's claims in this case that the government is liable *for its own negligence* in regard to assumed duties with respect to safety which, under Alaska tort law, suffice to prove retained control and therefore liability for the contractor's negligence as well.[26]

---

[24] *See* Government's Reply at 5 *citing Moody*, 753 F. Supp. at 1047. Interestingly, *Moody* held that, under New York labor law, if an owner *had* actual or constructive notice of an unsafe condition and failed to do anything about it then the owner may be held liable for resulting injuries. *Id.* at 1048.

[25] *See* Government's Reply at 6 *citing Berghoff*, 737 F. Supp. at 202.

[26] *Berghoff* - in regard to *the government's* alleged negligence - failing to supervise construction in such a manner as to inspect and discover safety problems – simply held that the right to supervise or inspect fell within the 'discretionary function' exception to the FTCA. Although the government has not argued directly that the discretionary function exception applies in our case, several of the cases cited by the government discuss the discretionary function exception in conjunction with the retained control analysis. Thus, plaintiff is compelled to note (prematurely) that the government's failure in our case to notify the contractor of noncompliance with safety requirements does not fall within the discretionary function exception to liability under the FTCA. *See Routh v. U.S.*, 941 F.2d 853, 855 (9th

The government's only nod to relevant Alaska tort law is it's brief discussion of *Anderson v. PPCT Management Systems, Inc.*, 145 P. 3d 503 (Alaska 2006). However, the quotation used by the government pertaining to an employer's liability for another's actions is misleading when taken out of context. [27] *Anderson* recognized the holdings of *Moloso, et al*, regarding the role of assumption of duties with respect to safety among the factors to be considered when deciding whether retained control applies:

> "We consider a number of factors when deciding whether retained control applies, none of which is individually determinative of the outcome. The right to conduct safety inspections and the authority to direct that dangerous equipment not be used or operations cease because of safety concerns indicated retained control in <u>Hammond v. Bechtel Inc.</u> and <u>Moloso v. State.</u> Obligating the independent contractor to follow specific procedures in accomplishing the work and retaining responsibility to revise job specifications to ensure worker safety were strong evidence of retained control in <u>Everette v. Alyeska Pipeline Service Co.</u> But in <u>Petranovich v. Matanuska Electric Ass'n,</u> the right to conduct inspections and stop work were not sufficient to attribute liability where the contract indicated that the independent contractor was responsible for safety compliance. Inspections and stop-work provisions do not necessarily establish retained control if the employer does not assume any affirmative safety duties. In <u>Moloso</u> the court also noted that "[i]f the employer reserves and exercises only the right to inspect the construction work to see that the contract specifications are met while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject [the employer] to liability.""[28]

Thus, the most recent Alaska Supreme Court precedent, rather than adopting the "strict control test" espoused by the Second Circuit and New York tort law, continues

---

Cir. 1991) ("… in this case the discretion was removed from the contracting officer in notifying the contractor of noncompliance with the safety requirements by the word "shall" in paragraph (d) of the accident prevention clause. The government undertook the obligation to oversee the safety of the work site by reserving to itself the responsibility to notify the contractor of noncompliance with its duties under the contract.")  Plaintiff reserves the right to brief the discretionary function issue fully if and when the government raises it as a defense to liability.

[27] *See* Government's Reply at 2-3 citing *Anderson* for the proposition that an employer could not be found to have retained control sufficient to create liability for the contractor's actions unless "the contractor is not entirely free to do the work in his own way."  145 P.3d 503, 510 (Alaska 2006).

[28] Anderson, 145 P.3d at 510 (citations and footnotes omitted).

to apply the same retained control factors originally noted in *Hammond*, *Moloso* and *Everette.*

    III.    **Even If the Strict Control Test were Applied to the Case at Bar to Determine the Government's Liability for the Contractor's Negligence, There is a Genuine Issue of Material Fact as to Day-to-Day Control Which Precludes Dismissal or Summary Judgment Regarding Control**

As described above and more particularly in the Complaint and Plaintiff's Opposition, plaintiff has presented facts sufficient when taken in the light most favorable to the plaintiff to establish the government's liability under Alaska tort law for its own negligence as well as the negligence of the independent contractor via the assumption of duty and the retained control theories of liability. Another element of support for plaintiff's contention that the government is liable for plaintiff's injury is evidence of the CoE's daily activities at the site as contained in government employee Glenn Zahn's declaration.[29]

Mr. Zahn, the CoE's Project Engineer and Quality Assurance Representative, declared that he himself "worked closely" with the independent contractor, visiting the site *every day* to "discuss issues on the job."[30] According to his declaration, he met for "as much as three hours" a day with the contractor or its representatives to "resolve any new or ongoing problems and concerns."[31] Mr. Zahn participated in the pre-construction meeting and reviewed the Accident Prevention Plan.[32] He personally checked "that [the safety plan] addressed every feature of work in [the] contract and

---

[29] Mr. Zahn's declaration was produced as Exhibit I to the Government's Motion to Dismiss and is discussed in Plaintiff's Opposition at 9-10.
[30] Government's Brief, Exhibit I at paragraphs 3 - 4.
[31] *Id.* at paragraph 4.
[32] *Id.* at paragraph 3.

hazards normally associated with each feature of work."[33] Mr. Zahn stated that on his visits to the site he was aware of the presence or absence of safety compliance issues.[34] Present in his declaration is also the inference that he spoke to the contractor about safety compliance and quality assurance issues at the site.[35]

Plaintiff contends that Mr. Zahn's declaration, taken in the light most favorable to the plaintiff, is an admission of the CoE's daily supervision and direction of construction and safety activities at the site as well as compelling evidence of the on-site coordinator's knowledge of the EMS, the site's safety plan and his active involvement in the approval process.

In order to rebut the clear implications of Mr. Zahn's declaration, on January 8, 2007, the government produced to plaintiff for the first time four "Daily Reports" which it allegedly "discovered" since filing the motion to dismiss.[36] The Daily Reports were submitted to prove that plaintiff's accident occurred while Mr. Zahn was on vacation at a time when "[t]here was no CoE day-to-day control of safety" and "Osborne [the contractor] was running the show."[37]

The government's production of this recently "discovered" evidence highlights two very important points. First, there is a genuine issue of material fact as to the CoE's supervision and direction of safety matters at the site. Mr. Zahn's declaration indicates extensive daily supervision and direction on this extremely valuable

---

[33] *Id.; see also* Exhibit 6 for certain of Mr. Zahn's e-mails as a reviewer of the safety plan.
[34] *Id.* at paragraphs 5 and 6.
[35] This inference is supported by the government's new exhibit "J" at ACE 3535, paragraph captioned "Safety" wherein it is noted that "[s]afety violations for lack of fall protection (observed yesterday by QC [Zahn]) were issued to two carpenters."
[36] See, e.g., Government's Reply at 11, footnote 3, requesting permission to file the new exhibits.
[37] Government's Reply at 12.

government project. The Daily Reports, on the other hand, indicate that Zahn was on vacation for a couple of days before and on the day of plaintiff's accident. Then again, the Daily Reports also indicate that Zahn (presumably the "QC" mentioned in Exhibit J) was aware of fall protection safety violations before he left on vacation. Finally, although the government asserts that Osborne [the contractor] "took charge of observing safety and enforcing it" during Zahn's absence,[38] the government also admits that no safety violations were issued in Zahn's absence (other than the violations Zahn himself pointed out before he left) until the day of plaintiff's near-fatal accident.[39] Even on that day, the Daily Report clearly states that the CoE and OSHA were on-site for the accident investigation. Thus, it is not at all clear from the face of these documents that the contractor "took charge of observing safety and enforcing it" at any time during Zahn's absence as the government contends.[40] In fact, the Daily Reports together with Zahn's declaration may actually indicate that it was Zahn, not the contractor, who assumed daily responsibility for safety implementation, inspection and compliance at the site.[41] It may be that this is the reason that no safety violations, including the uncovered floor opening into which plaintiff fell, were noticed or recorded during Zahn's absence. Taken in the light most favorable to the plaintiff, the evidence suggests that Zahn was involved in daily

---

[38] *Id.*
[39] *Id.*
[40] *Compare and contrast* Government's Reply at top of page 12 to new Exhibit M at ACE 3494.
[41] Both the contractual provisions and *the actual exercise of control* are relevant to the issue of whether or not the CoE assumed responsibility for or retained control of safety implementation, inspection and compliance at the site. *See Moloso*, 644 P.2d at 211; *see also Petranovich v. Matanuska Electric Assn.*, 22 P.3d 451, 454 (Alaska 2001) *citing Moloso*.

supervision and direction at the site and assumed affirmative duties with respect to safety.

At best, the declaration and Daily Reports present a genuine issue of material fact as to the CoE's day-to-day supervision and direction at the site, the CoE's knowledge regarding ongoing fall protection and other safety violations before the accident and the CoE's assumption of duties with respect to safety. This genuine issue of material fact is relevant to the issue of retained control and precludes dismissal or summary judgment in the government's favor.[42]

Second, discovery has not yet begun. No requests for admission, interrogatories or document production requests have been served by either party. No depositions have been taken. Mr. Zahn's declaration – procured by the government for purposes of this motion and not subject to cross-examine by plaintiff – is the sole testimony available to date in support of the government's position. In stark contrast to the government's lack of supporting evidence, the Second Circuit retained control decisions cited by the government were supported by "extensive deposition testimony" submitted by both parties[43] and "voluminous and uncontradicted testimony" that the contractor acted alone without the government's involvement or direction in every aspect of the actions which led to the plaintiff's injury.[44] Such is not the case here.

---

[42] Of course, plaintiff also maintains its previous contention that the issue of retained control is "normally a question of fact for the jury to determine." *Moloso*, 644 P. 2d at 212 *citing Everette*, 614 P.2d at 1347 and *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 935 (Alaska 1968).
[43] *Moody,* 753 F. Supp. at 1044, footnote 7.
[44] *Lipka* 369 F.2d at 291.

Furthermore, the Daily Reports upon which the government places such great weight were produced to the plaintiff for the first time in conjunction with the government's reply brief only one month ago. Plaintiff has had no opportunity to conduct discovery or investigation into the facts contained in these newly produced documents.[45]

## IV.  CAUSATION

Referencing back to *Anderson*, the government asserts that "the control retained must be related to the cause of the injury."[46] Then, inexplicably, the government makes this remarkably offensive observation:

> "The Plan did not push Wallender into the opening, nor did the Plan have anything to do with what Wallender was doing, because Wallender failed to refer to the Plan at all. He did not even use the other safety method in the Plan, which was to tie off. Protection was to be obtained by "the use of a guardrail system, cover or personal fall arrest system." It really did not matter what was in the Plan because Wallender did not follow anything. People cause accidents, not paper. Wallender chose how he was to remove the anchors. Wallender chose not to use any of the fall protection. Wallender is simply wrong when he argues that the CoE approved "the very fall protection methods which led to Wallender's injuries." Wallender simply did not use any of the approved methods."[47]

Apparently, the government has retained nothing of the "lessons learned" from plaintiff's horrific accident and injuries.

On September 10, 2002, just one month after plaintiff's accident, the CoE, rather than blaming the plaintiff for not being "tied off," focused on the true cause of

---

[45] In this regard, plaintiff also intends to request the production of *all* Daily Reports generated during construction at the site, not just the four reports cherry-picked by the government and produced on January 8th.
[46] Government's Reply at 10; *Anderson*, 145 P.3d at 510.
[47] Government's Reply at 10 (citations to record omitted).

Page 14

the accident – the CoE's negligent failure to approve and implement a fall protection plan which complied with applicable safety standards:

> "Floor and wall holes and openings pose a substantial hazard and are the subject of their own Section 24 of EM 385-1-1.  *On Corps jobs, openings in floors <u>must</u> be covered or barricaded.  Use of personal fall protection to mitigate this hazard is not an acceptable alternative.  This is in keeping with the preferred use of engineering and solutions to hazards ahead of using personal protective equipment (PPE).  Note that Section 24 is not cited in the EM 385-1-1 Index under Fall protection nor referenced in the fall protection sections.  Reviewers must make a special effort to assure that this requirement is properly covered in contractor fall protection plans and implemented in the field.*
>
> \*\*\*
>
> In conclusion, Government reviewers must assure that proper review and acceptance of contractor fall protection plans are accomplished and include covering or barricading floor openings if they are present on the project.  Government Quality Assurance representatives should become familiar with their contractors' fall protection plan and the manufacturer's instructions for use of the fall protection PPE being used on the jobsite.  Fall protection equipment should be checked to assure it is being installed, used and removed correctly in accordance with manufacturer's instructions."[48]

The government's conclusion is consistent with plaintiff's expert Frank Burg's conclusion that it is well accepted within the safety and health profession that elimination of the floor opening hazard with a secure cover, rather than reliance on guardrails or personal protective equipment, was the first choice for safety engineering at the site.[49]  It is also consistent with Mr. Burg's opinion that:

> "...Human Factors experts have recognized the tendency for humans to believe/assume that their passage through buildings and structures will be safe

---

[48] Plaintiff's Opposition, Exhibit 17 ("Safety Lessons Learned") at p. 2 (emphasis added).  The CoE also notes that the personal fall protective equipment was not installed or used properly and that "[a]lthough this did not contribute to this accident...had the carpenter fallen while hooked up this way the anchor would have been subjected to higher than anticipated loading."  Id. at p. 2, paragraph 2.  In other words, <u>the anchor would not have held or prevented the fall or injury</u>.

[49] Preliminary Report of Frank Burg, dated October 23, 2006, attached to Plaintiff's Opposition as Exhibit 19 at p. 3, paragraph 5.

and that responsible parties have taken appropriate action for their protection. Workers do not expect that holes will be unprotected and are accustomed to expect such hole will be protected by barricade and /or covers.  Safety professionals understand that individuals such as Mr. Wallender will assume they would be protected by such measures.  It is for this reason that the NFPA Life Safety Code, BOCA, OSHA, Corp of Engineers and many other safety standards require floor openings to be barricaded, and/or securely covered."[50]

In the face of the government's previous admissions and uncontradicted evidence that (a) the fall protection plan's provision of three apparently equal fall protection alternatives violated OSHA as well as safety standards, customs and practices within the industry, (b) tying off was not an acceptable fall protection alternative and (c) tying off wouldn't have arrested plaintiff's fall, it is unfathomable that the government still would argue that plaintiff caused the accident because he "did not tie off" and "did not use any of the approved methods."  It was not for plaintiff to dictate or choose the appropriate method for protection from a fall through a floor opening - or to design, approve and implement a safe fall protection plan.  That responsibility rested squarely with the CoE.

At the very most, the government's argument regarding causation presents an issue of fact for the jury.


... .. ...

... .. ...

---

[50] *Id* at paragraph 7; *see also* Plaintiff's Opposition at 12 regarding plaintiff's last memories before his injury occurred: "[h]e remembers removing the anchors and wondering why they were so close to the edge of the opening.  He also remembers that there was no barricade around the hole and that he does not know why that was the case.  The next thing he remembers is waking up in the hospital."

## CONCLUSION

The government contends that it 'missed something' and that 'missing something' should not subject it to liability. The FTCA, the Restatement 2nd of Torts, Alaska tort law, 9th Circuit precedent, and the U.S. Supreme Court say otherwise. The government's motion should be denied.

RESPECTFULLY SUBMITTED this 8TH day February, 2007, at Kenai, Alaska.

ATTORNEY FOR PLAINTIFF

/s/ PETER R. EHRHARDT
LAW OFFICE OF PETER R. EHRHARDT
215 Fidalgo Ave., Ste. 203
Kenai, AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
E-mail: ehrhardt@law.kenai.com
AK Bar Number: 8006016

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8TH, 2007,
a copy of the foregoing Plaintiff's Sur-Reply
was served electronically on:

S. Lindquist - Asst. US Attorney

By: /s/ Nathan Birchfield